HOME INDEMNITY CO. v. HOECHST CELANESE CORP.

[128 N.C. App. 226 (1998)]

THE HOME INDEMNITY COMPANY, THE HOME INSURANCE COMPANY, AND CITY INSURANCE COMPANY, PLAINTIFFS v. HOECHST CELANESE CORPORATION; AETNA CASUALTY & SURETY COMPANY; AIU INSURANCE COMPANY; ALLSTATE INSURANCE COMPANY; AMERICAN CENTENNIAL INSURANCE COMPANY; AMERICAN HOME ASSURANCE COMPANY; AMERICAN MOTORIST INSURANCE COMPANY; AMERICAN PROFESSIONALS INSURANCE COMPANY; AMERICAN RE-INSURANCE COMPANY; ASSOCIATED INTERNATIONAL INSURANCE COMPANY; BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA; CALIFORNIA UNION INSURANCE COMPANY; CENTENNIAL INSURANCE COMPANY; CERTAIN UNDERWRITERS AT LLOYDS LONDON AND CERTAIN LONDON MARKET INSURANCE COMPANIES; CERTAIN UNDERWRITING SYNDICATES OF THE ILLINOIS INSURANCE EXCHANGE; CERTAIN UNDERWRITING SYNDICATES OF THE INSURANCE EXCHANGE OF THE AMERICAS; CIGNA INSURANCE COMPANY; COLUMBIA CASUALTY COMPANY; COMMERCIAL UNION INSURANCE COMPANIES; CONTINENTAL CASUALTY COMPANY; CONTINENTAL INSURANCE COMPANY; CRUM & FORSTER INSURANCE COMPANY; EMPLOYERS INSURANCE OF WAUSAU, A MUTUAL COMPANY; EMPLOYERS MUTUAL CASUALTY COMPANY; ERIC REINSURANCE COMPANY; EXCESS INSURANCE COMPANY, LIMITED; FEDERAL INSURANCE COMPANY; FIREMAN'S FUND INSURANCE COMPANY; FIRST STATE INSURANCE COMPANY; FREMONT INDEMNITY INSURANCE COMPANY; GIBRALTAR CASUALTY COMPANY; GOVERNMENT EMPLOYEES INSURANCE COMPANY (GEICO); HARBOR INSURANCE COMPANY; HARTFORD ACCIDENT AND INDEMNITY COMPANY; HIGHLANDS INSURANCE COMPANY; HUDSON INSURANCE COMPANY; INSURANCE COMPANY OF NORTH AMERICA; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; INTERNATIONAL SURPLUS LINES INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; LONDON GUARANTEE AND ACCIDENT COMPANY OF NEW YORK; LUMBERMEN'S MUTUAL CASUALTY INSURANCE COMPANY; MEADOWS SYNDICATE, INC.; NATIONAL CASUALTY COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A.; NEW ENGLAND INSURANCE COMPANY; NEW ENGLAND REINSURANCE COMPANY; NORTH RIVER INSURANCE COMPANY; NORTH STAR REINSURANCE CORPORATION; NORTHWESTERN NATIONAL CASUALTY COMPANY; NORTHWESTERN NATIONAL INSURANCE COMPANY; PACIFIC INSURANCE COMPANY; PROGRESSIVE AMERICAN INSURANCE COMPANY; PRUDENTIAL REINSURANCE COMPANY; ROYAL INDEMNITY COMPANY; SIGNAL INSURANCE COMPANY; ST. PAUL FIRE AND MARINE INSURANCE COMPANY; STONEWALL INSURANCE COMPANY; TORTUGA CASUALTY INSURANCE COMPANY; THE TRAVELERS INDEMNITY COMPANY; TWIN CITY FIRE INSURANCE COMPANY; VIK RE SYNDICATE, INC., UNDERWRITERS REINSURANCE COMPANY; UNITED INSURANCE COMPANIES, INC.; X.L. INSURANCE COMPANY LIMITED; ZURICH INSURANCE COMPANY; DEFENDANTS

No. COA96-1408

(Filed 6 January 1998)

1. Trial § 67 (NCI4th)— insurer's summary judgment motion— policies and endorsements produced by insured—affidavit by insurer's attorney—estoppel to deny authenticity

The insured was estopped from denying the authenticity of liability policies and endorsements relied upon by the insurer to

HOME INDEMNITY CO. v. HOECHST CELANESE CORP.

[128 N.C. App. 226 (1998)]

support its motion for summary judgment in an action regarding insurance coverage for pollution clean-up where the policies and endorsements were produced by the insured's broker in response to discovery requests and were attached to the verified affidavit of the insurer's attorney.

2. **Trial § 75 (NCI4th)— summary judgment—insurance policies and endorsements—attorney's affidavit—authentication**

The verified affidavit of the insurer's attorney stating that insurance policies and endorsements had been produced by the insured and its broker in response to a deposition subpoena *duces tecum* was based on personal knowledge and was sufficient to authenticate the policies and endorsements for summary judgment purposes. N.C.G.S. § 1A-1, Rule 56(e).

3. **Insurance § 50 (NCI4th)— general liability insurance—surplus lines carrier—pollution exclusion—prior form approval**

A surplus lines insurance carrier was required by N.C.G.S. § 58-3-150 to get prior approval by the Department of Insurance for absolute pollution exclusion clauses in general liability policies issued for a manufacturing plant in this state.

4. **Insurance § 895 (NCI4th)— general liability insurance—pollution exclusion clause—use before approval by Department of Insurance—subsequent approval—clause not void**

Failure of a surplus lines insurer to get prior approval from the Department of Insurance for absolute pollution exclusions in general liability policies for a polyester manufacturing plant in this state as required by N.C.G.S. § 58-3-150 did not render the pollution exclusions void and unenforceable where the exclusions were not contrary to public policy and were subsequently approved by the Department of Insurance.

5. **Insurance § 895 (NCI4th)— general liability insurance—soil and groundwater contamination—exclusion of coverage for clean-up**

A clause in a general liability policy excluding coverage for all injury or damage "caused by seepage and/or pollution and/or contamination of air, land, water and/or any other property, however caused and whenever occurring" was enforceable and excluded

coverage for the investigation and clean-up of contamination of soil and groundwater by pollutants generated by the insured's polyester manufacturing plant.

**6. Insurance § 895 (NCI4th)— general liability insurance— pollution exclusion clauses—named peril exceptions— other provisos—coverage not restored**

Named peril exceptions to absolute pollution exclusion clauses for fires, explosions, violent discharges, and railroad accidents did not restore coverage by the policies for the investigation and clean-up of contamination of soil and groundwater by pollutants generated by the insured's polyester manufacturing plant, even if occurrences of certain named perils contributed to the contamination, where other provisos in the policies excluded coverage for costs of investigating and remediating environmental contamination.

Appeal by defendant Hoechst Celanese Corporation from order entered 28 August 1996 by Judge Marvin K. Gray in Mecklenburg County Superior Court. Heard in the Court of Appeals 18 November 1996.

This appeal concerns insurance coverage for contamination claims under thirteen (13) Lloyds London and Certain London Market Insurance Companies ("Lloyds") general liability policies in effect from 1985-89. The insured, Hoechst Celanese Corporation ("HCC"), obtained the policies at issue from its American insurance broker in New York. The policies were placed pursuant to the surplus lines laws of the State of New York. Lloyds is not admitted or authorized to conduct the business of insurance in the states of North Carolina or New York. For purposes of this appeal which concerns North Carolina sites, the parties agree that North Carolina law applies.

HCC has owned and operated a polyester manufacturing plant in Salisbury, North Carolina, since 1966. Pollutants generated in the normal course of operation have included glycol and Dowtherm. Glycol was disposed of at an on-site treatment plant from 1969 through 1974. HCC has also operated an on-site wastewater treatment plant since 1966. From 1966 through April 1990, the Salisbury plant also disposed of its waste at a nearby off-site landfill known as the Needmore Road landfill.

HCC's manufacturing operations at the Salisbury plant and disposal of waste at the Needmore Road landfill caused degradation of

**HOME INDEMNITY CO. v. HOECHST CELANESE CORP.**

[128 N.C. App. 226 (1998)]

soil and groundwater. Glycol and Dowtherm were among the constituent contaminants identified in the groundwater. On 28 April 1988, the State of North Carolina issued two notices of non-compliance to HCC concerning the contamination of groundwater beneath the Salisbury Plant and the Needmore Road landfill. On 6 April 1990, the United States Environmental Protection Agency ("EPA") issued an administrative order directing further cleanup and investigation of the Salisbury Plant site. HCC has also been operating under a state mandate to clean up the contamination at the Needmore Road landfill. HCC seeks to recover the costs of environmental investigation, remediation and cleanup, which aggregate over $30 million for expenses at the Salisbury Plant and over $15 million for expenses at the Needmore Road landfill.

HCC filed suit in New Jersey on 14 February 1989 seeking a determination that primary insurance policies issued to HCC cover the claims. On 9 March 1989, The Home Indemnity Company, one of the defendants in the New Jersey case, filed this action in North Carolina seeking a declaratory judgment as to the same insurance policies and claims. In August 1989, this case was stayed to allow the New Jersey case to proceed, but that stay was lifted in December 1992.

On 29 March 1996, defendants Lloyds moved for partial summary judgment concerning claims arising from the site in Salisbury, North Carolina, which consists of the HCC plant in Salisbury as well as the Needmore Road landfill. The motion was based on "absolute pollution exclusions" contained in certain Lloyds' policies. Following a hearing on 23 July 1996, partial summary judgment was entered for defendants on 28 August 1996. The trial court certified the issues raised by defendants' motion for immediate appeal pursuant to G.S. 1A-1, Rule 54(b). HCC appealed on 20 September 1996.

*Mendes & Mount, L.L.P., by Henry Lee and Gary P. Schulz, for defendant-appellee Certain Underwriters at Lloyds London and Certain London Market Insurance Companies.*

*Kilpatrick Stockton, L.L.P., by Jackson N. Steele and Richard E. Morton, for defendant-appellee Certain Underwriters at Lloyds London and Certain London Market Insurance Companies.*

*Parker, Poe, Adams & Bernstein, L.L.P., by Irvin W. Hankins, III and Josephine H. Hicks, for defendant-appellant Hoechst Celanese Corporation.*

*Lowenstein, Sandler, Kohl, Fisher & Boylan, by Michael Dore and David Field, for defendant-appellant Hoechst Celanese Corporation.*

EAGLES, Judge.

We first consider whether there was sufficient evidence before the trial court to support Lloyds' motion for summary judgment. HCC argues that summary judgment was not appropriate because there were genuine issues of material fact concerning what exclusion language was included in the policies and when that language became effective. HCC contends that as the moving party, Lloyds had the burden of putting into evidence the insurance policies relied upon, and that Lloyds failed to meet this burden. First, HCC maintains that the only evidence of the insurance policy language filed with Lloyds' motion for summary judgment was contained in Lloyds' own interrogatory responses, each answered upon "information and belief." HCC contends that affidavits based upon "information and belief" must be disregarded because affidavits in support of a motion for summary judgment must be made on personal knowledge. *See* G.S. 1A-1, Rule 56(e); *Blackwell v. Massey*, 69 N.C. App. 240, 316 S.E.2d 350 (1984); *Schoolfield v. Collins*, 281 N.C. 604, 189 S.E.2d 208 (1972). Second, HCC contends that Lloyds' attempt to get the policies admitted based on attorney's affidavits failed to meet the standards of Rule 56 because the policies were not authenticated by anyone with personal knowledge. In addition, HCC contends that the papers submitted by Lloyds created genuine issues of material fact concerning the exact policy language relied on in Lloyds' motion. HCC argues that one policy relied upon by Lloyds, policy no. UVA0194, has two different overlapping pollution exclusion endorsements. Other polices include endorsements containing pollution exclusions dated three years after the policies expired. Accordingly, HCC argues that because genuine issues of material fact remain, summary judgment was erroneously granted.

Lloyds argues that it met its burden of proof because their motion for summary judgment was initially supported by sworn answers to interrogatories and later by the actual policies containing the specific policy language found in the sworn answers to interrogatories. The policies were attached to the verified supporting affidavit of attorney Henry Lee, Lloyds' attorney. Lloyds argues that this affidavit was based upon personal knowledge because the affidavit explains that the attached policies were produced by HCC and its insurance broker during discovery in this same lawsuit and that their attorney, Henry Lee, clearly would have personal knowledge of documents produced by HCC and its insurance broker in response to a deposition subpoena *duces tecum*. Accordingly, Lloyds contends that the supporting

affidavit of attorney Henry Lee was competent evidence and suffi-
cient to authenticate the policies. Furthermore, Lloyds argues that
the Lee affidavit was timely filed and that HCC never objected to or
moved to strike the affidavit. Additionally, Lloyds contends that there
was no issue regarding the effective dates of the endorsements on
policy no. UVA0194 because the effective dates of the two endorse-
ments are different and do not overlap. Finally, Lloyds argues that
HCC is estopped from denying the authenticity of policies which HCC
itself produced in discovery in this very case. Accordingly, Lloyds
maintains that summary judgment was properly granted.

HCC's argument centers around three policies: UVA0194, NTC344
and NTC345. HCC first points to Policy No. UVA0194, which covers
the period of 1 May 1987-1 May 1990. HCC claims that there are gen-
uine issues concerning the exact language of the policy, as there are
endorsements with overlapping coverage. UVA0194 contains two
Category II pollution exclusions. The first exclusion, listed as
Endorsement No. 1, contains provisos which operate to bar coverage
during the policy's first year (May 1987-May 1988) for the pollution
claims at issue here. However, the policy also contains a second
endorsement, No. 27, which amends the policy effective 1 May 1988.
Endorsement No. 1 in the policy was effective for the first year of the
policy, while Endorsement No. 27 was effective for the remaining two
years of the policy. The dates are clear and do not overlap.

The next issue was whether Endorsement No. 27 to policy no.
UVA0194 contained a proviso precluding coverage for the environ-
mental claims at issue here. The policy copy attached to Henry Lee's
affidavit included in the original record on appeal did not include
such a proviso. In response to an order of this court, the Clerk of
Superior Court of Mecklenburg County has supplemented the record
on appeal and certified to us a true copy of the proviso contained in
the trial court's record. Accordingly, the record on appeal now
includes proviso (a) to Endorsement No. 27 of policy no. UVA0194
which purports to preclude coverage for the environmental claims at
issue here.

HCC next argues that genuine issues of material fact remain con-
cerning policy numbers NTC344 and NTC345. Those policies ended in
1986, but contain pollution exclusions dated in 1989, after the initial
New Jersey lawsuit in this case was filed. HCC questions whether
these endorsements were actually part of the policies, and if so, when
did they go into effect.

**[1],[2]** HCC's arguments are unpersuasive. HCC is estopped from denying the authenticity of the policies and their endorsements because these policies were produced by HCC's insurance broker in response to discovery requests in this case. In this record, the policies and endorsements are attached to the verified affidavit of Lloyds' attorney in this case who explained that the policies had been produced by HCC and its insurance broker in response to a deposition subpoena *duces tecum*. This affidavit was based on personal knowledge and satisfies Rule 56(e). *See Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980). Accordingly, the trial court properly considered the exclusions as authentic and as part of the policy. The endorsements clearly state that they are "effective" from "inception." Accordingly, there is no genuine issue of material fact and summary judgment as to policy numbers NTC344 and NTC345 was properly granted.

HCC appears to raise no issues concerning the language of the remaining policies. Lloyds met its burden of proof concerning these policies and summary judgment was appropriately granted.

We next consider whether the absolute pollution exclusions contained in policies issued prior to approval by the North Carolina Department of Insurance are enforceable. The North Carolina Department of Insurance approved absolute pollution exclusions on 24 February 1986. Five of Lloyds' policies issued prior to this date contain an "absolute pollution exclusion." HCC first argues that Lloyds is subject to Chapter 58 because they insured property interests in North Carolina. *See* G.S. 58-3-5. Accordingly, HCC contends that Lloyds was required to comply with 58-3-150 which states that "[i]t is unlawful for any insurance company doing business in this State to issue ... any policy ... until the forms of the same have been submitted to and approved by the Commissioner [of Insurance of North Carolina]." HCC maintains that Lloyds was doing business in this state, as defined by G.S. 58-16-35, by issuing a contract of insurance to a corporation licensed to do business in North Carolina and collecting premiums for the contracts. HCC argues that Lloyds failed to comply with G.S. 58-3-150 when it inserted the unapproved absolute pollution exclusion in policies issued to HCC.

HCC next argues that because Lloyds did not comply with G.S. 58-3-150, the unapproved language should be void. First, HCC contends that portions of contracts that violate statutes are against public policy and should be null and void. Furthermore, they contend that

**HOME INDEMNITY CO. v. HOECHST CELANESE CORP.**

[128 N.C. App. 226 (1998)]

the statute's purpose is to protect insureds and should be strictly construed. HCC points out that other jurisdictions hold similar unapproved language void. Finally, HCC argues that the dicta from *Blount v. Royal Fraternal Ass'n, 163 N.C. 167, 79 S.E.2d 299 (1913)*, relied upon by Lloyds, is distinguishable because the court in *Blount* ruled on a purely evidentiary basis, holding that the plaintiff failed to carry its burden of proof that the Insurance Commissioner had not approved the policy.

Lloyds first contends that the Surplus Lines Act, G.S. 58-21-1 *et seq.* exempts surplus lines carriers, such as Lloyds, from supervision by the North Carolina Department of Insurance and that prior approval of the policy was not necessary. *See* G.S. 58-21-50. Lloyds alternatively argues that even if the policies were required to be approved in advance, Lloyds' failure to obtain the required approval does not invalidate the clause. *See Blount.* Lloyds also maintains that the absolute pollution exclusion at issue is not contrary to the public policy of the State of North Carolina as evidenced by the fact that the language was ultimately approved by the Department of Insurance. Finally, Lloyds maintains that the contracts should be enforced as written, because the premium and risks which the policies were intended to cover were negotiated between the parties and the carefully negotiated policy should not be rewritten to allow HCC to reap a windfall and to secure far greater protection than it paid for.

[3],[4] We hold that Lloyds' failure to get advance form approval does not result in the absolute pollution exclusion being void. G.S. 58-3-5 states that insurance companies covering risks in this State must comply with Chapter 58. Nowhere in Article 21 (the Surplus Lines Act) are surplus lines carriers expressly exempted from the regulation of Chapter 58. Accordingly, 58-3-150 applies and Lloyds was required to get form approval from the Department of Insurance. However, despite Lloyds' failure to get form approval of the absolute pollution exclusions, their failure to get approval does not result in the exclusions being void. Nowhere does G.S. 58-3-150 declare that all unapproved policy provisions are void and unenforceable. In fact, the General Assembly specifically provided for penalties for violations of Chapter 58 in G.S. 58-2-70 and G.S. 58-3-100. G.S. 58-3-100 grants the Commissioner the power to revoke, suspend, or refuse to renew the license of any insurer. G.S. 58-2-70 provides for monetary fines and restitution. Voiding of the policy is not provided for by statute. Furthermore, the dicta in *Blount* is persuasive. *Blount* interpreted a

predecessor statute to G.S. 58-3-150. While the court in *Blount* did rule on a purely evidentiary basis, the court also addressed the issue of unapproved policy language. The court determined that even if the Insurance Commissioner had not approved the policy, "we would not give our assent to the position of the plaintiff that this would avoid the effect of the provision stamped on the certificate, leaving other parts of the certificate in force." *Id.* at 170. The court further noted that "[t]he statute does not purport to deal with the validity of the contract of insurance, but with the insurance company." *Id.*

Other jurisdictions addressing the issue of whether unapproved language should be voided have reached similar conclusions. In *F.D.I.C. v. American Cas. Co. of Reading, Pa.*, 975 F.2d. 677 (10th Cir. 1992), the court opined that "[v]oidance of [an] exclusion to an insurance policy is a severe penalty which alters the very terms of the deal between the parties. It requires the insurer to provide coverage for uncontracted risk, coverage for which the insured has not paid." *Id.* at 683. The dicta in *Blount* and the reasoning of *Reading* are persuasive in the context of this litigation.

We note that the pollution exclusion at issue is not contrary to the public policy of the State of North Carolina, as evidenced by its subsequent approval for use by the Department of Insurance. In holding that the unapproved form here is not void, we do not address the situation where an unapproved form is never submitted for approval or is subsequently rejected for use by the Department of Insurance. Accordingly, we hold that the absolute pollution exclusion at issue in this case in not contrary to public policy and the policies should be enforced as written including the pollution exclusion language.

We next consider whether the policies' exceptions to the Lloyds' policies' pollution exclusion provisions render those pollution exclusions inapplicable to the Salisbury site. The pollution exclusion in the policies at issue contain so-called "named peril exceptions" for fire, explosions, violent discharges and railroad accidents. HCC maintains that occurrences of these named perils contributed to contamination at the Salisbury plant and accordingly should restore coverage. Furthermore, HCC contends that proviso no. 5 in policy nos. NTC341, UVA0194 (Endorsement No. 1), UVA0195, UVA0201 and NTC145/UVA0270 precluding coverage for cleanup costs do not apply to groundwater contamination because groundwater is not "property . . . owned . . . by the Insured or under the control of the Insured." *See C.D. Spangler Constr. Co. v. Industrial Crankshaft and En-*

*gineering Co., Inc.,* 326 N.C. 133, 146, 388 S.E.2d 557, 565 (1990) (groundwater is a state resource).

Lloyds argues that the so-called "Category I" absolute pollution exclusions "clearly and unambiguously" deny coverage for liability caused by seepage, pollution, or contamination. Lloyds further contends that, assuming *arguendo* that the named peril events took place, the provisos to the absolute pollution exclusion in the policies containing the so-called "Category II" absolute pollution exclusion apply to deny coverage for all costs of investigating and remediating environmental contamination. Further, Lloyds argues that HCC has not forecast evidence that named peril events took place and caused appreciable damage. *See Highlands Ins. Co. v. Aerovox Inc.,* 424 Mass. 226, 676 N.E.2d 801 (Mass. 1997).

**[5]** There are two types of absolute pollution exclusions in the policies involved in this appeal. The first type, what Lloyds labels as Category I exclusions, exclude insurance coverage for all injury or damage "caused by seepage and/or pollution and/or contamination of air, land, water and/or any other property, however caused and whenever occurring." The Category I exclusion applies based on its plain language, and HCC does not contest its applicability. The exclusion should be enforced. We hold that summary judgment on the basis of the Category I exclusion was properly granted as to those policies containing the Category I exclusion (policy nos. NTC342, NTC343, NTC344, NTC345, NTD146/UVA0271, NTD147/UVA0272).

**[6]** The second type of exclusion, labeled Category II by Lloyds, is similar to the Category I exclusion but in addition to the absolute pollution exclusion the Category II exclusions also contain certain exceptions and provisos. The exclusions restore coverage upon the happening of a named-peril, such as fire or explosion. However, the provisos in these policies prevent the exclusions from restoring coverage. Policy Nos. UVA0146, UVA0149 and UVA0194 (Endorsement No. 27) contain proviso (a) which states that the policy does not apply to any claim relating to "any liability to test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize Pollutants . . . ." Policy nos. NTC341, UVA0195, UVA0201, and NTD145/UVA0270 also contain provisos which operate to deny restoration of coverage. Proviso No. 3 bars coverage "arising out of any site or location used . . . for the handling, processing, treatment, storage, disposal, or dumping of any waste materials or substances." Proviso No. 4 bars coverage "for the cost of evaluating or monitoring or controlling seep-

ing or polluting or contaminating substances." HCC's argument that proviso No. 5 does not apply here because this is groundwater contamination is not determinative because proviso nos. 3 and 4 do apply here. Claims relating to the Salisbury Plant and the Needmore Road landfill are clearly barred by these provisos. Accordingly, the Category II absolute pollution exclusions in policy nos. UVA0146, UVA0149, UVA0194, NTC341, UVA0195, UVA0201, and NTD145/ UVA0270 should be enforced and summary judgment was properly granted.

In conclusion, we hold that there were no genuine issues of material fact and that summary judgment was properly granted. The policies should be enforced as written because unapproved policy language which is subsequently approved for use will not be declared void. Therefore, the absolute pollution exclusions apply and operate to deny coverage for the contamination claims at issue. Accordingly, we hold that summary judgment should be affirmed.

Affirmed.

Judges WYNN and MARTIN, Mark D., concur.