CANANWILL, INC.; Reliance Insurance Company; and W. Joseph Burns, Trustee for Pilot Freight Carriers, Inc., Plaintiffs,

v.

EMAR GROUP, INC.; Walsh Group, Inc.; National Union Insurance Company of Pittsburgh, P.A.; American Home Insurance Company; AIG Risk Management, Inc; American International Group; Van Buerden & Associates Insurance Services, Inc., Defendants.

Nos. 2:96CV00558, 2:96CV00560, 2:97CV00338.

United States District Court, M.D. North Carolina.

March 5, 1999.

Eric P. Handler, Turner Enochs & Llyod, P.A., Greensboro, NC, for Cananwill, Inc., Reliance Insurance Company.

Robert E. Price, Jr., Robert E. Price, Jr. & Assoc., P.A., Winston–Salem, NC, for W. Joseph Burns, Trustee for Pilot Freight Carriers, Inc., plaintiff.

Michael F. Schultze, Cranford, Schultze & Tomchin, Charlotte, NC, for Van Buerden & Associates Insurance Services, Inc., appellant.

Kristen G. Lingo, Manning, Fulton & Skinner, Raleigh, NC, Michael T. Medford, Manning, Fulton & Skinner, Raleigh, NC, for EMAR Group, Inc., Walsh Group, Inc.

Kenneth Richard Jacobson, Jacobson & Beavers, Greensboro, NC, Robert E. Boydoh, Jr., Jacobson & Beavers, Greensboro, NC, for National Union Fire Insurance Company of Pittsburgh, PA, American Home Assurance Company, AIG Risk Management, Inc., and American International Group.

Michael F. Schultze, Cranford, Schultze & Tomchin, Charlotte, NC, for Van Buerden & Associates Insurance Services, Inc., defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

### I. INTRODUCTION

This matter is before the Court on appeal from an order of the United States Bankruptcy Court for the Middle District of North Carolina. For the reasons stated herein, and as a result of a *de novo* review, the decision of the Bankruptcy Court is affirmed to the extent that it is consistent, and reversed to the extent it is inconsistent, with the rulings set forth in this Memorandum Opinion.

## II. FACTUAL BACKGROUND

In the Summer of 1988, Pilot Freight Carriers, Inc. ("Pilot Freight"), a North Carolina trucking company, retained the services of EMAR Group, Inc., and Walsh Group, Inc. (collectively "EMAR"), insurance brokers and agents located in New Jersey and New York, respectively, to solicit on its behalf a new workers' compensation insurance policy. Pilot Freight's current policy was due to expire on October 11, 1988.

As a result of EMAR's efforts, the National Union Insurance Company of Pittsburgh, P.A. ("National Union"), a New York-based insurance company incorporated in Pennsylvania, issued a workers' compensation insurance proposal on October 5, 1988 ("the October 5 proposal"). The October 5 proposal consisted of standard premium terms and retrospective terms. The retrospective terms called for an additional payment over-and-above the standard premium in the amount of $2,872,205.

The retrospective terms, if accepted, would convert the insurance agreement into a retrospectively rated policy. An insurance policy is "retrospectively rated" when it calls for a premium based on actual claims made. Although the insured pays an estimated premium at the inception of the policy period, an additional premium may be due, or excess premium may be refunded, depending upon actual losses incurred, a determination made at the end of the policy period. All parties involved understood the concept of retrospective rating and all parties acknowledge that the October 5 proposal provided for such a policy. Although Pilot Freight was prepared to accept the October 5 proposal, it informed National Union that it would not be able to secure a letter of credit for the $2,872,205, as was required according the terms of the offer. In response, National Union issued a revised proposal on October 12, 1988 ("the October 12 proposal"), which permitted Pilot Freight to satisfy its $2,872,205 obligation by making a cash payment of $2,872,205 at the inception of the policy period. The October 12 proposal, which had no other material changes, was duly accepted by Pilot Freight.

In order to make the necessary $2,872,205 payment to National Union, Pilot Freight entered into an Insurance Premium Finance Agreement ("Premium Finance Agreement") on October 12, 1988, with Cananwill, Inc., a Pennsylvania company specializing in insurance premium finance and which was owned at the time by Reliance Insurance Company (collectively "Cananwill"). Pursuant to the Premium Finance Agreement, Cananwill loaned Pilot Freight $5,361,811 so that Pilot Freight could pay the workers' compensation insurance premiums to National Union. The Premium Finance Agreement included the following security agreement:

> [Pilot Freight] assigns to Cananwill as security for payment of [the loan] all sums payable to [Pilot Freight] with reference to the [National Union insurance policy], including, among other things, any gross returns or unpaid premiums and any payment on account of loss which results in reduction of unearned premium.

(Ex. 187.) In order to carry out the transaction, Cananwill sent a check for the entire loan amount to EMAR with the understanding that the entire sum would, in turn, be remitted to National Union. EMAR, however, at Pilot Freight's direction, did not remit the entire amount to National Union at that time. Instead, it deposited the $5,361,811 into its own bank account, issued checks to National Union in the amounts of $2,872,205 and $625,503, and transferred the remaining $1,864,103 into a newly-created trust. The trust funds would be used to make monthly payments to Cananwill and National Union for the premium finance loan and for the workers' compensation insurance, respectively.

The two checks issued to National Union were deposited in National Union's bank

account and commingled with funds received from other policyholders. National Union maintains its insurance accounts on a modern computer system. This system tracks each policyholder's account. Therefore, at any given time National Union can determine, among other things, how much money has been received from a particular customer and how many claims have been filed under a particular policy.

On October 22, 1988, National Union issued a Workers Compensation and Employers Liability Insurance Policy ("the Standard Policy")[1] to Pilot Freight, effective October 11, 1988. This Standard Policy contained two merger clauses. The first appeared on the bottom of the first cover page: "THESE POLICY PROVISIONS WITH THE INFORMATION PAGE AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THIS POLICY." The second appeared on page one:

> This policy includes at its effective date the Information Page and all endorsements and schedules listed there. It is a contract of insurance between [Pilot Freight] ... and [National Union].... The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by [National Union] to be part of this policy.

The parties to the Pilot Freight insurance policy duly signed the Standard Policy. On November 14, 1988, and December 12, 1988, EMAR, on behalf of Pilot Freight, sent National Union checks for insurance premiums in the amounts of $625,502 and $625,503, respectively.

On or about November 17, 1988, National Union, through EMAR, sent Pilot Freight a Premium Deferral Agreement which set forth the retrospective terms contained in the October 5 and October 12 proposals, and requested that Pilot

Freight sign and return the document. The Premium Deferral Agreement was reviewed by Kenneth Gerrity ("Gerrity"), Pilot Freight's Director of Risk Management. In a letter dated November 21, 1988, and addressed to John Rapier of EMAR, Gerrity objected to several provisions of the Premium Deferral Agreement. Among other things, Gerrity took issue with the section entitled "EARNED PREMIUM COMPUTATION." He wrote:

> If a retro[spective] return is due Pilot Freight ..., I expect that we receive 100% of this return. [National Union] is currently holding over $2.8 million of our money in collateral, therefore I see absolutely no need for [National Union] to hold on to additional retro[spective] returns. We have never been involved in a retro[spectively rated policy] that did not return 100% of a retro[spective return] when it was due to the company.

(Ex. 368.) The Premium Deferral Agreement was never signed by Pilot Freight.

Despite the fact that Gerrity also wrote that "the [Premium Deferral] Agreement is not acceptable in its current form," (*id.*), he testified during discovery as follows:

> Q. Did you consider the provisions of th[e] Premium Deferral Agreement inconsistent with the arrangements that you understood at the time that the deal with Cananwill was made?
>
> A. No, not really. The ... Premium Deferral Agreement is something that any insurance policy, since th[e] time that I've been involved in, you always get one of those things and it seems like they never get signed. It's like not a big deal to get them signed, from my experience. There was nothing more in there, you know, grossly in error. There were some things that they wanted us to agree to that I didn't feel that we should agree to and that's what I[ ] outlined [in the November 21, 1988, let-

---

1. National Union technically issued two insurance policies, one providing coverage in California and one providing coverage in oth-

er states. For the purposes of these appeals, the policies will be referred to as if they were one.

ter]. There were a few, you know, minor adjustments, nothing basic—major wrong with it.

(Gerrity Dep. Vol. I at 177–78.) It should be noted, however, that National Union never filed any of the documents constituting the Pilot Freight insurance policy with state regulators.

Soon thereafter and prior to January 1989, Pilot Freight removed EMAR as its insurance broker of record and began using the services of Van Buerden & Associates Insurance Services, Inc. ("Van Buerden"), a California insurance agent. In January 1989, Van Buerden, on behalf of Pilot Freight, met with representatives of National Union to discuss the possibility of reducing the $2,872,205 held by the insurance company. National Union concluded that, in light of the fact that Pilot Freight had significantly reduced its payroll since October 1988, a refund was appropriate. National Union agreed to reduce the $2,872,205 by $1,053,120. On or about February 15, 1989, National Union processed the $1,053,120 refund to Pilot Freight by executing a wire transfer to Van Buerden which, in turn, wired the funds to Pilot Freight.

Later in February 1989, Pilot Freight defaulted on its obligations to Cananwill and National Union. National Union canceled the insurance policy on April 16, 1989.

## III. PROCEDURAL BACKGROUND

On July 13, 1989, an involuntary bankruptcy petition was filed against Pilot Freight in the United States Bankruptcy Court for the Middle District of North Carolina. W. Joseph Burns was duly appointed as the Trustee of the bankrupt estate.

On June 22, 1990, Cananwill instituted an Adversary Proceeding to recover monies allegedly owed by the Trustee. After settling its claims with Cananwill in July 1993, the Trustee realigned to join Cananwill as a plaintiff for further proceedings.

On April 15, 1994, Cananwill and the Trustee filed an Amended and Restated Complaint against EMAR, National Union, Van Buerden, and other entities not relevant to this appeal. The Amended and Restated Complaint contained six "counts." The first and second counts are alternative claims, asserting that the Trustee is entitled to unearned premiums held by National Union with respect to the Pilot Freight insurance policy. (Am. & Restated Compl. ¶¶ 54–66.) In count one, the Trustee seeks recovery by calculating unearned premiums due and owing based upon an interpretation that the policy was not retrospectively rated. (*Id.* at ¶¶ 55–58.) In count two, the Trustee seeks recovery by calculating unearned premiums due and owing as if the policy was retrospectively rated. (*Id.* at ¶¶ 63–65.) Count three consists of a claim by Cananwill that National Union's delivery of the $1,053,120 refund to Van Buerden constituted a conversion of Cananwill's property. (*Id.* at ¶¶ 67–72.) Count four is an allegation by Cananwill that EMAR and National Union negligently made certain misrepresentations to Cananwill with respect to the nature of the Pilot Freight insurance policy. (*Id.* at ¶¶ 73–80.) In count five Cananwill claims that National Union is responsible for the negligence of EMAR pursuant to the doctrine of *respondeat superior.* (*Id.* at ¶¶ 81–86.) In count six Cananwill alleges that EMAR fraudulently concealed from Cananwill certain materials terms of the Pilot Freight insurance policies. (*Id.* at ¶¶ 87–102.)

Various counterclaims and cross-claims were subsequently asserted by the parties. These counterclaims and cross-claims are not relevant to the appeals currently before the Court, with the following exception: National Union asserted a cross-claim against EMAR, contending that, as the broker of record for Pilot Freight, EMAR had a duty to National Union to see that the insurance policies met the terms of the revised proposals accepted by Pilot Freight.

Several motions for summary judgment were made in the Bankruptcy Court. By orders dated December 28, 1995, and January 5, 1996, the Bankruptcy Court granted two motions.[2] On May 2, 1996, the Bankruptcy Court denied all remaining motions. Specifically, United States Bankruptcy Judge William L. Stocks wrote that "[t]he court is not satisfied from the materials relied upon by the moving parties that there are no genuine issues of fact in this case." (Order dated 5/2/96 at 3.) Five of these denials serve as the basis for the appeals now before this Court.[3]

## IV. APPEALS BEFORE THE COURT

As noted above, each appeal asserted by the various parties contends that the Bankruptcy Court erred when it denied summary judgment. The specific motions denied by the Bankruptcy Court and on appeal before this Court are described below.

First, National Union moved for partial summary judgment as to the Trustee's claim that it was entitled, on behalf of Pilot Freight, for a turnover of unearned premiums due and owing to Pilot Freight, calculated based upon the conclusion that the insurance policy was not retrospectively rated (count one).[4] Second, both National Union and Van Buerden moved for summary judgment as to Cananwill's claim that National Union's delivery of the $1,053,120 refund to Van Buerden constituted a conversion of Cananwill's property (count three). Third, EMAR moved for partial summary judgment as to Cananwill's claims that EMAR made certain misrepresentations about, and fraudulently concealed certain material terms of, the insurance policy issued to Pilot Freight (counts four and six). Lastly, EMAR moved for summary judgment as to National Union's cross-claim that EMAR, as the broker of record for Pilot Freight, had a duty to National Union to see that the insurance policies met the terms of the revised proposals accepted by Pilot Freight.

## V. STANDARD OF REVIEW

■ Conclusions of law made by a bankruptcy court are to be reviewed *de novo*. *In re Ballard*, 65 F.3d 367 (4th Cir.1995). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, the Court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Judges are not "'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such character that it would warrant the jury in finding a verdict in favor of that party.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct.

---

2. The Bankruptcy Court granted Van Buerden's motion for summary judgment as to National Union's cross-claim that Van Buerden committed an unfair and deceptive act by allegedly concealing from National Union the terms of the Premium Finance Agreement when National Union wired the $1,053,120 to Van Buerden. The Bankruptcy Court also granted EMAR's motion for summary judgment as to National Union's cross-claim that EMAR committed an unfair and deceptive act by allegedly concealing the existence of the Premium Finance Agreement.

3. Two of these denials—the denials of National Union's and Van Buerden's motions for summary judgment as to Cananwill's claim of conversion—will be treated together for the purposes of this Court's review.

4. Although National Union's motion is styled as one directed towards both counts one and two of the Amended and Restated Complaint, the Court notes that count two includes a calculation of premium that is consistent with National Union's argument, to wit, that the insurance policy at issue was retrospectively rated. As such, National Union's motion is, in effect, only directed towards count one.

2505, 91 L.Ed.2d 202, 213 (1986) (quoting *Schuylkill & Dauphin Improvement & R.R. Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)).

## VI. DISCUSSION

The Court will address the appeals in the order they were described in Section IV of this Memorandum Opinion.

A. *National Union's Motion for Partial Summary Judgment as to the Trustee's Claim That it Was Entitled, on Behalf of Pilot Freight, to a Turnover of Unearned Premiums Due and Owing to Pilot Freight, Calculated Based upon the Conclusion That the Insurance Policy Was Not Retrospectively Rated (Count One)*

As noted previously, count one of the Amended and Restated Complaint alleges that the Trustee is entitled to unearned premiums held by National Union with respect to the Pilot Freight insurance policy. Specifically, the Trustee contends, on behalf of Pilot Freight, that based upon the Trustee's calculations National Union owes Pilot Freight $4,333,981. (Am. & Restated Compl. ¶ 58.) The Trustee arises at this figure as follows:

| | |
|---|---|
| Total premium payments received by National Union | $6,850,079 |
| Less: February 1989 refund to Pilot Freight | (1,053,120) |
| Less: Earned premiums by National Union | (1,462,978) |
| Unearned premiums held by National Union | $4,333,981 |

(*Id.* at ¶¶ 45, 57, 58.) The Trustee's calculation of earned premiums is based on its contention that the Pilot Freight insurance policy was *not* retrospectively rated.

With its motion in the Bankruptcy Court, National Union sought partial summary judgment on the ground that the Pilot Freight insurance policy *was* retro-

spectively rated and, therefore, the Trustee's calculation of unearned premiums was incorrect. It contended in the Bankruptcy Court that earned premiums on the policy amount to $3,600,787, as set forth by the Trustee in count two, and, therefore, unearned premiums would, at most, amount to $1,703,828, not $4,333,981, calculated as follows:

| | |
|---|---|
| Total premium payments received by National Union | $6,850,079 |
| Less: February 1989 refund to Pilot Freight | (1,053,120) |
| Less: Earned premiums by National Union | (3,600,787) |
| Unearned premiums held by National Union | $1,703,828 |

(*Id.* at 64.) With this appeal, National Union argues that the Bankruptcy Court erred when it denied the partial summary judgment motion since there is no genuine issue of material fact and the insurance policy, as a matter of law, was retrospectively rated. (Case 2:96CV00560, Br. of Appellant National Union at 7–8.)[5] In opposition to the appeal, the Trustee and Cananwill have filed a joint response.

At the outset, the Court notes that the parties do not contest the alternative calculations of earned premium. In other words, the parties agree that, if the policy is not deemed to be retrospectively rated, then earned premiums would amount to $1,462,978. The parties also acknowledge that, if the policy is deemed to be retrospectively rated, then earned premiums would amount to $3,600,787. The amount at issue, therefore, is the difference between these two figures, or $2,630,153.

National Union's argument is twofold. First, it contends that the Trustee judicially admitted in filings prior to the Amended and Restated Complaint that the insurance policy was retrospectively rated. Second, National Union asserts that, even if the Trustee's admissions do not constitute a complete bar to its claim, applicable rules of contract construction mandate partial

**5.** The Court notes that the parties have briefed the various issues regarding these appeals in several filings submitted in connection with multiple cases. As such, the Court will refer to the court documents by case number, filing, and, where applicable, page number.

summary judgment in National Union's favor because, as a matter of law, the insurance policy was retrospectively rated. The Court will address each argument separately.

### 1. Judicial Admission

Prior to the submission of the Amended and Restated Complaint on April 15, 1994, by the Trustee and Cananwill, the Trustee asserted in multiple filings with the Bankruptcy Court that the Pilot Freight insurance policy was, indeed, retrospectively rated.

On February 18, 1992, the Trustee filed a brief in support of a motion before the Bankruptcy Court requesting summary judgment as to Cananwill's claims that it was entitled to funds held by National Union as unearned premium. In the "Facts Presented and Procedural Posture" section of its brief, the Trustee asserted the following:

> Pilot [Freight] obtained multi-state workers compensation insurance for the period October 11, 1988 to October 10, 1989 from National Union.... The terms of the agreement with National Union were that National Union would receive $3,829,606.00 in premium, paid in installments, together with $2,872,205.00 in collateral.... *The policy was "retrospectively rated."*

(Ex. 216 at 2 (emphasis added) (citations omitted).) Later in his brief, the Trustee further contended that (1) the policy was retrospectively rated and (2) the "collateral" was to be applied to any shortfall in premium due after the retrospective calculations, in the event that Pilot Freight failed to pay National Union directly for the additional premiums:

> [I]t is clear that the parties to the Workers' Compensation Insurance Policy ... agreed that Pilot [Freight] would, in addition to its performance under the insurance policy, place collateral with National Union as security for its future performance under the insurance policy. *The Workers' Compensation policy*

*agreed to between Pilot [Freight] and National Union was a retrospectively rated policy.* A retrospectively rated policy is one where within certain minimum and maximum limits, the premium due on the policy may change based on the claims experienced under the policy. If the claims were such, that upon a retrospective rating, the premium would increase, then, in that event the policy holder, Pilot [Freight], would be billed for the difference between the premium already paid and the premium due. If Pilot [Freight] did not pay that amount, then the insurance company could seek payment from the collateral posted.... The Function of the collateral security fund was to protect National Union from future defaults by Pilot [Freight], in view of the shaky financial condition of the company.

(*Id.* at 11 (emphasis added) (citations omitted).)

Next, on March 20, 1992, the Trustee filed his reply brief in connection with his motion for summary judgment filed on February 18, 1992. In the brief, the Trustee further contends that the policy was retrospectively rated. (Ex. 229 at 4–5.) In doing so, he noted that "[e]ven in the negotiations respecting the terms of the retrospective agreement, ... Gerrity ... refers to the retrospective nature of the polic[y]." (*Id.* at 5.)

Lastly, on July 28, 1992, the Trustee filed a supplemental memorandum at the request of the Bankruptcy Court. Attached to the memorandum was, among other things, an affidavit by Roger D. Hershman ("Hershman"), Chief Executive Officer of the National Transportation Consulting Group, Inc., "a management consulting company having experience in operational, financial, and risk management aspects of the trucking industry." (Hershman Aff. ¶ 1.) In the affidavit, Hershman set forth detailed information regarding the workers' compensation laws and related insurance policies. (*Id.* at

¶¶ 1–15.) In addition, he reviewed aspects of the Pilot Freight insurance policy and noted the following:

The National Union policy was retrospective. It was based on the actual experience of the insured during the policy period. Certainly, not all workers compensation policies are retrospective, but this one certainly was.... 

The National Union ... policy with Pilot [Freight] is an example of a retrospectively rated policy.

(*Id.* at ¶¶ 21, 26.)

As noted above, National Union contends that these assertions constitute judicial admissions by the Trustee that support National Union's position that the policy was, in fact, retrospectively rated. As such, it argues that the assertions constitute a conclusive bar to the Trustee's present claim. Therefore, National Union further asserts, the Bankruptcy Court erred when it denied National Union's motion for partial summary judgment. In opposition, the Trustee and Cananwill argue that the doctrine of judicial admission applies only to statements of fact, not to arguments of law. They contend that "whether the Policy was (or was not) retrospective is not a question of fact; rather, it is a question of law regarding the proper construction of the Policy." (Case 2:96CV00560, Joint Br. of Pls./Appellees in Resp. to the Appeal of National Union at 8.) The Trustee and Cananwill further argue that, even if the statements were factual in nature, they do not constitute judicial admissions because the pleading on which the brief was based was subsequently amended. (*Id.* at 9.)

 The doctrine of judicial admission is based upon the view that "[a] party is bound by his pleadings and, unless withdrawn, amended, or otherwise altered, the allegations contained in all pleadings ordinarily are conclusive as against the pleader." *Davis v. Rigsby*, 261 N.C. 684, 686, 136 S.E.2d 33, 34 (1964). "The effect of a judicial admission is to establish the fact for the purposes of the case and to eliminate it entirely from the issues to be tried." *Rollins v. Junior Miller Roofing Co.*, 55 N.C.App. 158, 162, 284 S.E.2d 697, 700 (1981). The doctrine of judicial admission applies to assertions of fact, not arguments of law. *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 716 (10th Cir.1993). A court may, in its discretion, treat statements in a brief as binding admissions of fact. *See, e.g., City Nat'l Bank v. United States*, 907 F.2d 536, 544 (5th Cir.1990). As the Fourth Circuit has explained,

[a] judicial admission is usually treated as absolutely binding, but such admissions go to matters of fact which, otherwise, would require evidentiary proof. They serve a highly useful purpose in dispensing with proof of formal matters and of facts about which there is no real dispute. Once made, the subject matter ought not to be reopened in the absence of a showing of exceptional circumstances, but a court, unquestionably, has the right to relieve a party of his judicial admission if it appears that the admitted fact is clearly untrue and that the party was laboring under a mistake when he made the admission.

*New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir.1963).

 Here, the Trustee asserted on multiple occasions in briefs supporting its prior pleading that the Pilot Freight insurance policy was "retrospectively rated." In other words, the Trustee admitted that the insurance policy, by his own definition, was "one where within certain minimum and maximum limits, the premium due on the policy may change based on the claims experienced under the policy." These assertions do not constitute arguments of law. At the very least, they are mixed assertions of law and fact. Factually, they constituted admissions regarding the terms of an agreement entered into between two parties. *See Universal Leaf Tobacco Co. v. Oldham*, 113 N.C.App. 490, 439 S.E.2d 179 (1994); *Rollins v. Junior*

*Miller Roofing Co.,* 55 N.C.App. 158, 162, 284 S.E.2d 697, 700 (1981).

In *Universal Leaf* two insurance companies—INA and Lloyds—had issued separate policies covering property owned by the plaintiffs. The property was destroyed by fire and a dispute arose as to which insurance policy provided the "primary" coverage and which insurance policy covered the "excess." Among other things, the trial court had found that one of the terms of the insurance policies issued by INA contained a typographical error. *Universal Leaf,* 113 N.C.App. at 493, 439 S.E.2d at 181.[6] In reversing this finding, the Court of Appeals of North Carolina noted that INA, in its answer to Lloyd's counterclaim, had alleged an affirmative defense which included an excerpt of the term at issue.[7] That excerpt was consistent with Lloyd's assertions. The court held that "INA's allegation ... constituted a judicial admission which INA could not thereafter contradict and which the trial court was bound to accept as true." *Id.* at 494, 439 S.E.2d at 181.

Similarly, in *Rollins* the plaintiffs alleged in their complaint that they entered into a contract with one of the defendants. That defendant, in turn, confirmed entering into the contract in its answer, and subsequently cited—and attached to its pleading—the same contract as the basis for its counterclaim. The plaintiffs then admitted entering into the contract in their reply. During discovery, the plaintiffs denied in depositions that the signature on the contract was that of one of the plaintiffs. With this testimony, they sought to defeat a summary judgment motion made by the defendant. In rejecting the deposition testimony, the Court of Appeals of North Carolina noted that the contract was attached to the defendant's counterclaim and "was established by the pleadings as the contract between the parties." *Rollins,* 55 N.C.App. at 161, 284 S.E.2d at 700. As a result, "[t]he *terms of the contract* ... were thus judicially admitted." *Id.* (emphasis added).

■ As indicated by *Universal Leaf* and *Rollins,* a court may apply the doctrine of judicial admission when a party pleads the factual existence or accuracy of terms of a contract in dispute. By asserting that the Pilot Freight insurance policy was "retrospectively rated," the Trustee was also asserting that the terms of the Premium Deferral Agreement, that is, retrospective rating, were a necessary part of the contract between National Union and Pilot Freight. Thus, the doctrine of judicial admission may apply in this instance.[8]

Moreover, with respect to the Fourth Circuit's guidance in *New Amsterdam,* it does not appear that the admitted fact is "clearly untrue" or that the Trustee was "laboring under a mistake" when he asserted that the agreement between National Union and Pilot Freight was retrospective in nature. The only material new factual development that would have had any effect upon the Trustee's prior plead-

6. The insurance policies issued by INA contained the following clause: "It is expressly agreed that this insurance will not cover to the extent of any other *valued* and collectible insurance...." *Universal Leaf,* 113 N.C.App. at 493, 439 S.E.2d at 181 (emphasis in original). The trial court found that the clause contained a typographical error to the extent that the word "valued" should actually have been "valid." *Id.* Lloyds had asserted that there was no such typographical error and that the clause was correct as written.

7. INA alleged as an affirmative defense that " 'INA issued policy number 434973 to Universal Leaf, which policy was in effect on October 3, 1986 and provided as follows: 7. It is expressly agreed that this insurance shall not cover to the extent of any other *valued* and collectible insurance....' " *Universal Leaf,* 113 N.C.App. at 493, 439 S.E.2d at 181 (emphasis in original).

8. The Trustee and Cananwill cite *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9,* 10 F.3d 700 (10th Cir.1993), in support of its position. *Guidry,* however, dealt with an attorney's assertion regarding the effect of a prior precedent on that attorney's case. Such an assertion is entirely a proposition of law and not a statement of fact.

ings was the final calculation of premium due under a retrospective calculation. Since that calculation resulted in a final figure that was substantially higher than the estimated amount as of the date of the Trustee's prior filings, it was of concern to the Trustee that the amount of unearned premiums available to the bankrupt estate of Pilot Freight substantially decreased. In fact, the Trustee acknowledged during oral argument that his primary motivation for now claiming that the policy was not retrospectively rated is that a nonretrospective calculation would result in the availability of more unearned premiums.

As noted above, the Trustee argues that even if the prior statements constituted factual assertions they cannot constitute judicial admissions because the pleading upon which the brief was based was later amended. This Court disagrees. Superseding a pleading by amendment affects the weight, not the competency, of statements made in the original:

> When a pleading is amended ... the superseded portion ceases to be a conclusive judicial admission; *but it still remains as a statement once seriously made ... and as such it is competent evidence* of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent.

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929) (emphasis added); *see also Kabatnik v. Westminster Co.*, 71 N.C.App. 758, 761, 323 S.E.2d 398, 400 (1984) (amendment to pleading affects weight, not competency, of assertions made in original).[9] Here, the pleading which the briefs supported was superseded by the Amended and Restated Complaint. As such, the prior factual assertions cannot constitute a conclusive judicial admission. The statements, however, are not rendered inadmissible, and may be considered by this Court.

This determination is consistent with the view that "[a] party ... cannot advance one version of the facts in its pleadings, *conclude that its interests would be better served by a different version,* and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." *United States v. McKeon,* 738 F.2d 26, 31 (2d Cir.1984) (emphasis added); *see also United States v. Belculfine,* 527 F.2d 941, 944 (1st Cir.1975) ("[J]udicial admissions generally arise only from deliberate voluntary waivers that expressly concede ... the truth of an alleged fact.").

Based upon the foregoing analysis, this Court finds that the Trustee judicially admitted in its prior filings that the Pilot Freight insurance policy was, in fact, retrospectively rated. However, the admission is not conclusive since the pleading the admissions supported was subsequently amended. As a result, it alone does not serve to bar the Trustee's claim.

### 2. Contract Construction

As noted previously, with its motion in the Bankruptcy Court National Union requested partial summary judgment as to the Trustee's first claim that the Pilot Freight policy was not retrospectively rated. National Union asserted that there was no genuine issue of material of fact and that, as a matter of law, the Pilot Freight insurance policy was retrospectively rated.

At the outset, the parties contest the law to be applied for the purposes of examining the Pilot Freight insurance policy. National Union asserts that North Carolina law applies because that state has a "close connection" to the insured. (Case 2:96CV00560, Br. of Appellant National Union at 16–17.) The Trustee and Canan-will, on the other hand, argue that New York law applies because the North Car-

---

9. Some courts have even suggested that the amendment of a pleading has no effect on the question of whether statements in the original may be judicially admitted. *See, e.g., Andrews*

*v. Metro N. Commuter R.R. Co.,* 882 F.2d 705, 707 (2d Cir.1989) ("The amendment of a pleading does not make it any the less an admission of the party.").

olina choice-of-law rule regarding contracts is the *lex locus*. (Case 2:96CV00560, Joint Br. of Pls./Appellees in Resp. to the Appeal of National Union at 11 n. 12.)

In North Carolina, contract construction issues are decided by applying the law of the state "where the contract was made." *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655 (1980). The Trustee and Cananwill contend that the Pilot Freight insurance policy was "made" in New York. (Case 2:96CV00560, Joint Br. of Pls./Appellees in Resp. to the Appeal of National Union at 11 n. 12.) However, section 58–3–1 of the North Carolina General Statutes provides as follows:

> All contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State *shall be deemed to have been made within this State and are subject to the laws thereof.*

N.C.Gen.Stat. § 58–3–1 (emphasis added). Since this case involves an insurance contract, and such application was taken by a resident of North Carolina, it is deemed made in North Carolina. Therefore, this Court will apply North Carolina law. *Collins & Aikman Corp. v. Hartford Accident & Indem. Co.*, 335 N.C. 91, 436 S.E.2d 243 (1993); *Pace v. New York Life Ins. Co.*, 219 N.C. 451, 14 S.E.2d 411 (1941) (North Carolina law applied when application for life insurance made by resident of North Carolina).

This Court recognizes that the Trustee and Cananwill argue that *Collins & Aikman* is "in conflict with the rule of *lex locus* contract, which has long been followed [in North Carolina] and which looks, even for insurance contracts, to the state where the last act occurred that was necessary to make the contract." (Case 2:96CV00560, Joint Br. of Pls./Appellees in Resp. to the Appeal of National Union at 11 n. 12.) In support of this proposition, they cite *Roomy v. Allstate Insurance Co.*, 256 N.C. 318, 123 S.E.2d 817 (1962). But the Supreme Court of North Carolina in *Collins & Aikman*, 335 N.C. 91, 436 S.E.2d 243 (1993), specifically declined to extend *Roomy* beyond its particular facts. The court in *Collins & Aikman* noted that *Roomy* held, "without any references to N.C.G.S. § 58–3–1 or its predecessor, that the law of the state[ ] in which the polic[y was] issued was the law that governed. It is the very few contacts with this state that distinguishes ... *Roomy* from this case." *Id.* at 94, 436 S.E.2d at 245. Similarly, this Court finds that, although the policies did not provide coverage within North Carolina, the extent of Pilot Freight's presence in the state (i.e., headquartered in Winston–Salem, North Carolina) at the time the insurance policy was issued constitutes a sufficient connection with the state and, therefore, consistent with *Collins & Aikman*, North Carolina law should apply to any examination of Pilot Freight's contractual relationship with National Union. *See also Martin v. Continental Ins. Co.*, 123 N.C.App. 650, 474 S.E.2d 146 (1996) (sufficient connection to warrant applying North Carolina law where 17.858% of vehicles insured through the policy at issue were in North Carolina).

As noted previously, the parties do not dispute, among other things, that (1) Pilot Freight and National Union intended to enter into a retrospectively rated insurance contract; (2) National Union's October 12 proposal, which included retrospective provisions, was accepted by Pilot Freight; (3) Pilot Freight obtained premium financing from Cananwill on October 12, 1988, and, through EMAR, paid National Union $2,872,205 and $625,503; (4) the Standard Policy was sent by National Union to Pilot Freight on October 22, 1988, and was duly signed by the parties; (5) the Standard Policy contained merger clauses; and (6) the Premium Deferral Agreement was sent by National Union to Pilot Freight on November 17, 1988, and was not signed by Pilot Freight.

Given these undisputed facts, National Union contends that, as a matter of contract law, Pilot Freight became bound by the retrospective terms of the Premium Deferral Agreement. (Case 2:96CV00560, Br. of Appellant National Union at 17–35.) The Trustee and Cananwill argue that, as a matter of contract law, the retrospective rating provisions contained in the October 12 proposal and agreed to by Pilot Freight do not apply because they were not included in the Standard Policy—which contained merger clauses—issued by National Union on October 22, 1988. (Case 2:96CV00560, Joint Br. of Pls./Appellees in Resp. to the Appeal of National Union at 10–21.) Considering the facts in the light most favorable to the Trustee and Cananwill, the nonmovants, this Court finds with respect to the construction of the contract that there is no genuine issue of material fact and, as a matter of law, the Pilot Freight insurance policy was, indeed, retrospectively rated.

▉▉▉▉ In analyzing the construction of a contract, a court must also determine to what extent matters outside a writing affect the rights and responsibilities of the parties to that contract. In doing so, a court must make multiple inquiries. *See Smith v. Central Soya of Athens, Inc.*, 604 F.Supp. 518 (E.D.N.C.1985). A court initially must determine whether the writing was "integrated." *Id.* at 524. Only findings of integration will implicate the parol evidence rule, which provides as follows:

> *Any or all parts of a transaction prior to or contemporaneous with a writing intended to record them finally are superceded and made legally ineffective by the writing.* The execution of the final writing may be termed the 'integration' of the transaction. By it all prior and contemporaneous negotiations or agreements, whether oral or written, are 'merged' into the writing, which thus becomes the exclusive source of the parties' rights and obligations with respect to the particular transaction or part thereof intended to be covered by it.

*Id.* (quoting 2 Brandis on North Carolina Evidence § 251 (1982) (emphasis in original)).

▉▉▉▉ The effect of the parol evidence rule further depends, however, on whether the integration was "partial" or "total." *Id.* Therefore, a court must next make such an inquiry. If the court finds that the writing was a total or complete integration, then "evidence of prior and contemporaneous negotiations and agreements are not admissible to vary, add to, or contradict the writing." *Id.* (citing *Rowe v. Rowe*, 305 N.C. 177, 185, 287 S.E.2d 840, 845 (1982)). If, however, the writing is determined to be only a partial integration, then "not only may prior or contemporaneous evidence be admitted to clarify any ambiguity, but evidence of consistent additional terms may also be introduced and incorporated in the writing by means of parol evidence." *Id.* (citing *Hoots v. Calaway*, 282 N.C. 477, 193 S.E.2d 709 (1973); *A & A Discount Ctr., Inc. v. Sawyer*, 27 N.C.App. 528, 219 S.E.2d 532 (1975)).

Following these rules, this Court must initially determine "whether the . . . writing[ ] . . . [was] intended by the parties as [a] final expression[ ] . . . of the terms contained therein, i.e. did the parties intend the writing[ ] to evidence their final agreement with regard to the included terms in the contract[ ]." *Id.* In other words, did Pilot Freight and National Union intend for the Standard Policy to evidence the final agreement with regard to the terms included in that document? National Union argues that, "[b]ecause Pilot Freight and National Union performed the contract in accordance with the [S]tandard [Policy] *and* the Premium Deferral Agreement after the [Standard Policy was] issued, it is clear that the [Standard Policy] alone [was] not intended to be the final expression of the terms between the parties." (Case 2:96CV00560, Br. of Appellant National Union at 35 (emphasis in original).) In response, the Trustee and Cananwill primarily argue that "the

threshold question of whether a contract is 'integrated' cannot be answered with parol evidence...." (Case 2:96CV00560, Joint Br. of Pls./Appellees in Resp. to the Appeal of National Union at 14.)

■ Contrary to the Trustee's and Cananwill's assertions, this Court may consider extrinsic evidence for the purposes of determining whether the writing was integrated: "Whether a writing has been adopted as an integrated agreement is ... to be determined in accordance with *all relevant evidence.*" Restatement (Second) of Contracts § 209 cmt. c. (1981) (emphasis added); *see also Burroughs Corp. v. Weston Int'l Corp.,* 577 F.2d 137, 140 (4th Cir.1978) ("The determination is dependent upon the facts of each case, and *no relevant evidence should be excluded* in making this preliminary determination." (emphasis added)).[10]

Applying the above rules to the case at hand, this Court finds that there was no integration as to the Standard Policy. It is undisputed that Pilot Freight and National Union intended their premium arrangements to reflect the retrospective rating calculations set forth in the October 12 proposal. There has been no evidence presented which would tend to indicate that the parties' intentions with respect to such premium arrangements ever changed. Rather, the facts tend to indicate that, at the time the Standard Policy was executed by the parties, the intention was to follow the retrospective terms set forth in the October 12 proposal and later embodied in the Premium Deferral Agreement. Gerrity's reaction to the Premium Deferral Agreement when it was sent to Pilot Freight in November is consistent with this finding. Had Pilot Freight intended for the *Standard Policy* to be a final expression of the premium terms, Gerrity would have rejected outright the Premium

Deferral Agreement's central purpose, to wit, the establishment of a retrospectively rated insurance agreement. Instead, he testified that his decision to forego signing the document was due to the fact that "[t]here were a few ... minor adjustments, nothing basic [or] major wrong with it." Given these undisputed facts, it is clear that the parties did not intend for the premium provisions in the Standard Policy to serve as the "last word" on those matters. Instead, both parties intended to have a retrospectively rated insurance policy, consistent with the terms set forth in the October 12 proposal and the Premium Deferral Agreement. In other words, the parties did not intend for the Standard Policy to be the final expression of the terms contained therein. Based upon the foregoing, therefore, this Court concludes that there was no integration with respect to the Standard Policy.

Having concluded that there was no integration with respect to the Standard Policy, this Court need not further consider whether any integration was partial or total. This Court further finds that the agreement between Pilot Freight and National Union included the retrospective rating terms set forth in the October 12 proposal and the Premium Deferral Agreement, and agreed to by Pilot Freight. Thus, this Court concludes that the Bankruptcy Court erred when it denied National Union's motion for partial summary judgment.

The Court notes that EMAR contends that, even if the Pilot Freight insurance policy was retrospectively rated, the contract is unenforceable because National Union failed to make certain state regulatory filings with respect to the policy. EMAR makes this argument in connection with its motion for partial summary judgment as to Cananwill's claims that EMAR

---

**10.** While the Court must determine whether the agreement is integrated before admitting parol evidence for the trier of fact's consideration, the Court is free to rely on this very same extrinsic evidence in reaching the threshold determination of whether the writing is integrated. *See* Restatement (Second) of Contracts § 209 reporter's note to cmt. c; *id.* § 213 cmt. b.

made certain negligent misrepresentations about, and fraudulently concealed certain material terms of, the insurance policy issued to Pilot Freight (counts four and six). That motion is addressed below (section VI.C.). Since this argument was made in connection with EMAR's motion, not National Union's, the Court will discuss the substantive issue it raises later in this Memorandum Opinion.

B. *National Union's and Van Buerden's Motions for Summary Judgment as to Cananwill's Claim That National Union's Delivery of the $1,053,120 Refund to Van Buerden Constituted a Conversion of Cananwill's Property (Count Three)*

■■■ As noted previously, count three of the Amended and Restated Complaint consists of a claim by Cananwill that National Union's delivery of the $1,053,120 refund to Van Buerden constituted a conversion of Cananwill's property. (Am. & Restated Compl. ¶¶ 67–72.)

With their motions in the Bankruptcy Court, National Union and Van Buerden sought summary judgment on the ground that, as a matter of law, a conversion claim could not be brought with respect to the $1,053,120. Specifically, they contended the money had been commingled on at least one occasion prior to the refund transaction and, therefore, the money could not be the subject of a conversion claim. With this appeal, National Union and Van Buerden argue that the Bankruptcy Court erred when it denied the summary judgment motions since there is no genuine issue of material fact and the $1,053,120 may not, as a matter of law, be the subject of a conversion action. (Case 2:96CV00558, Br. of National Union at 10–19.) Cananwill has filed a response in opposition to the appeal.

As stated above, Pilot Freight borrowed $5,361,811 from Cananwill on October 12,

1988, in order to purchase insurance from National Union. The Premium Finance Agreement executed between Pilot Freight and Cananwill included the following provision: "[Pilot Freight] assigns to Cananwill as security for payment of [the loan] all sums payable to [Pilot Freight] with reference to the [National Union insurance policy]...." To carry out the transaction, Cananwill sent a check for the entire loan amount to EMAR which, in turn, deposited the funds into its own bank account, issued checks to National Union in the amounts of $2,872,205 and $625,503, and transferred the remaining $1,864,103 into a newly-created trust. The two checks issued to National Union were deposited in National Union's bank account and commingled with funds received from other policyholders. Early in 1989, National Union agreed to reduce the $2,872,205 by $1,053,120. On or about February 15, 1989, National Union processed the refund to Pilot Freight by executing a wire transfer to Van Buerden which, in turn, wired the funds to Pilot Freight. Based on these events, Cananwill has asserted that National Union's delivery of the $1,053,120 refund to Van Buerden constituted a conversion of Cananwill's property.

■■■ Conversion is defined as " 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.' " *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (quoting 89 C.J.S. Trover & Conversion § 1.).[11] When the goods or personal chattel involved is money, then such money may be subject to conversion "only when it is capable of being identified, and described as specific chattel, although identification as far as is needful to determine the rights of the parties will be suffi-

---

11. Although the parties disagree over whether New York, North Carolina, or California law should apply, they concede that the law with respect to conversion is the same in all three states.

cient." 89 C.J.S. *Trover & Conversion* § 23 (1955).

National Union and Van Buerden argue that the conversion claim must fail because the $1,053,120 was commingled on at least two occasions and, therefore, it was not "capable of being identified." First, they note that EMAR commingled the funds when it deposited Cananwill's check for $5,361,811 in its own account and issued two checks in lesser amounts to National Union. Second, they state that the money was commingled by National Union when it deposited the checks from EMAR. In support of their argument, National Union and Van Buerden cite, among other decisions, cases holding that in order to be subject to conversion the money in question must be segregated in separate bank accounts and not commingled with other funds. *See, e.g., Massive Paper Mills v. Two–Ten Corp.*, 669 F.Supp. 94 (S.D.N.Y. 1987) (money not paid into designated fund); *Willingham v. United Ins. Co. of Am.*, 628 So.2d 328 (Ala.1993) (funds not segregated). However, Cananwill, relying on *Owens v. Andrews Bank & Trust Co.*, 265 S.C. 490, 220 S.E.2d 116 (1975), asserts that even if EMAR and/or National Union commingled the money before the alleged conversion, it may still bring such a claim because "th[e] money ... *became* 'identifiable' as specific chattel." (Case 2:96CV00558, Br. of Pls./Appellees in Resp. to the Appeal of Van Buerden at 9 (emphasis in original).) This Court agrees.

In *Owens* the Supreme Court of South Carolina affirmed a directed verdict against a bank which had converted funds from one of its depositors. The plaintiff, who along with her husband maintained a joint deposit account with the defendant-bank, agreed to participate in the bank's "Christmas Club account plan." Under the plan, the bank transferred $20 per week from the plaintiff's and her husband's joint account to a Christmas Club account maintained by the plaintiff alone. Pursuant to the plan, the plaintiff's Christ-

mas Club account was closed after several months and a check in the amount of $879 was issued by the bank to the plaintiff. The check was sent by the bank to a local branch manager for subsequent delivery to the plaintiff. The branch manager, however, refused to deliver the check to the plaintiff until the plaintiff's husband satisfied a separate financial obligation with the bank. The plaintiff sued the bank for conversion of the $879 and prevailed.

In its ruling, the Supreme Court of South Carolina held that the bank was liable for misappropriation and conversion of the plaintiff's funds by the branch manager, the bank's agent. *Owens*, 265 S.C. at 494, 220 S.E.2d at 120. Although it acknowledged that the plaintiff's money transferred to her Christmas Club account was commingled with other depositors' funds, the court explicitly endorsed the notion that money may "become identifiable" after it has been commingled by the convertor:

> The Bank's claim that plaintiff's funds could not be converted because they were commingled and confused with all other funds on deposit is without merit. *The Bank itself specifically identified and designated the sums* belonging to plaintiff *by issuing its check* ..., drawn and made payable in the amount of $879.00.

*Id.* (emphasis added). This Court finds the Supreme Court of South Carolina's reasoning persuasive to the extent that this Court also finds that commingled funds may nonetheless be the subject of a conversion action if, subsequent to the commingling, the convertor specifically identifies the funds. Even if the funds received by National Union were commingled, National Union—like the defendant bank in *Owens* —specifically identified and designated the sums belonging to Pilot Freight by issuing an order to wire transfer $1,053,120 to Van Buerden. Accordingly, this Court concludes that the money was "capable of being identified and described as specific chattel" and, therefore,

any commingling that occurred prior to the wire transfer from National Union to Van Buerden would not prevent Cananwill from bringing its conversion claim.

National Union and Van Buerden argue that *Owens* is inapposite to the instant action because the transaction in that case involved the issuance of a check, not a wire transfer. They contend that Cananwill's argument relies on the notion that the Uniform Commercial Code explicitly states that instruments can be converted, (Case 2:96CV00558, Br. of Pls./Appellees in Resp. to the Appeal of Van Buerden at 11), and since wire transfers—unlike checks— are not considered negotiable instruments, then *Owens* cannot support the conclusion that the processing of a wire transfer can result in the specific identification of commingled funds. (Case 2:96CV00558, Reply Br. of Van Buerden at 5–6; Case 2:96CV00558, Reply Br. of National Union at 4–5.)[12] Van Buerden cites *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal.App.4th 472, 56 Cal. Rptr.2d 756 (1996), in support of the dis-

tinction. However, the court in *Software Design* merely noted that wire transfers are not "instruments" for the purposes of section 3420 of the California Commercial Code[13] and, therefore, the plaintiff could not maintain an action for conversion based on that statute. *Id.* at 485, 56 Cal. Rptr.2d at 764. Cananwill, however, has not asserted such a statutory claim[14] but, rather, is seeking relief for an alleged conversion of money under the common law. Moreover, the court in *Owens* reasoned that the defendant bank identified the funds "by issuing" a check to the plaintiff. The mere fact that National Union chose to wire the refund and not to mail a check does not alter this Court's conclusion that it specifically identified the funds in order to process the disbursement.[15]

National Union and Van Buerden also cite *United States Fidelity & Guaranty Co. v. Bass*, 619 F.2d 1057 (5th Cir.1980), in support of their contention that commingling serves to erect a *per se* bar to a conversion claim. In *United States Fidelity*, a construction company contracted with

**12.** Although Cananwill's brief concludes that "a wire transfer ... can also be the subject of conversion[,]" during oral argument the parties clarified that count three of the Amended and Restated Complaint actually alleges that it is the money that is the subject of the alleged conversion, not the wire itself.

**13.** Section 3420 of the California Commercial Code, entitled "conversion of instrument," provides in pertinent part as follows:

The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (1) the issuer or acceptor of the instrument or (2) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a copayee. Cal.Comm.Code § 3420(a) (1998).

**14.** The North Carolina statute addressing conversion of instruments, N.C.Gen.Stat. 25–3–420(a), is identical to California's provision.

**15.** Subsequent to *Owens*, the Court of Appeals of South Carolina distinguished the case when it found that certain insurance premiums did not constitute a type of "money" which may be the subject of a conversion action. The court, in *Austin v. Independent Life & Accident Insurance Co.*, 296 S.C. 156, 370 S.E.2d 918 (S.C.Ct.App.1988), characterized the *Owens* case as follows: "A check representing the amount of a specific Christmas Club account was converted by a bank when the bank withheld delivery of the check in an effort to pressure the spouse of the Christmas Club owner to pay his separate financial obligations to the bank." *Id.* at 161, 370 S.E.2d at 921. The plaintiffs in *Owens*, however, were not concerned with the check issued by the bank. Rather, their action was for conversion of the funds represented by that check. *Owens*, 265 S.C. at 491, 220 S.E.2d at 117 ("This action was brought by [plaintiff] against [defendant] to recover actual and punitive damages for conversion of her Christmas Club *account*.") (emphasis added). Similarly, Cananwill is not concerned with the wire transfer authorization document. Its action is for conversion of the underlying funds.

the state of Alabama to construct and improve a public road. In connection with the job, the construction company furnished a performance bond and a payment bond with the plaintiff-surety. The construction company completed the work but was unable to pay some labor and material claims. The surety paid those claims under its payment bond. The surety agreement between the construction company and the surety provided that, once the work was completed, any payments remaining due on the contract shall be paid to the surety. The surety duly notified the defendant-Alabama highway department official of the surety agreement and instructed the official not to disburse funds to the construction company without prior surety approval. Sometime thereafter, the Internal Revenue Service ("IRS") served the defendant-state treasurer a notice of levy on the construction company's next payment. The treasurer, in turn, directed the highway official to deliver the next payment warrant to the treasurer. The highway official subsequently issued two warrants, one to the treasurer and one to the construction company. The surety sued for, among other things, conversion.

Although the Fifth Circuit reversed the district court's conclusion that a conversion of the warrants had occurred, upon close examination it is clear that the decision was based on the fact that the surety had insufficient legal title, not because commingling serves as an absolute bar to a conversion claim. The court reasoned that the district court erred when it found that the surety had "sufficient legal title." *Id.* at 1061. The Fifth Circuit wrote that

> [t]he district court's conclusion that [the surety] was subrogated to the state's rights in the ... payments ... followed *from the erroneous finding that [the surety] met [the construction company]'s* unpaid obligations under the performance bond rather than under the payment bond. Because [the surety] acted under the payment bond, it was a creditor rather than a subrogee with respect

to the state's rights in the ... payments.... *The critical point in [this] action for conversion is that [the surety] did not acquire legal title and a right to immediate possession* when a nonidentified account was merely changed into specific payment warrants....

*Id.* (emphasis added). Accordingly, although the court wrote that it "disagree[d]" with the surety's argument "that the two payment warrants ... were identified property to which it had legal title and a right to possession[,]" *id.* at 1060, it is evident from the court's discussion following that disagreement that the portion of the surety's argument with which the court disagreed was the status of the surety's legal title and right to possession, not with the contention that previously commingled funds can, in some instances, be specifically identified and designated by an alleged convertor.

Lastly, National Union contends that if a convertor can identify previously commingled funds by authorizing a wire transfer then "the act of conversion itself ... would also identify the money." (Case 2:96CV00558, Reply Br. of National Union at 2.) Therefore, National Union asserts, "money would almost always be identifiable under a conversion claim." (*Id.*) This argument ignores, however, the fact that Cananwill has brought its claim against National Union for diverting—as opposed to withholding—certain funds. If a plaintiff alleges conversion against a defendant that has received, but refuses to turnover, funds that were commingled upon receipt, the general rule—that commingled money cannot be the subject of a conversion action—would still apply. *See, e.g., Massive Paper Mills v. Two–Ten Corp.,* 669 F.Supp. 94 (S.D.N.Y.1987). But once the alleged convertor has specifically identified and segregated the funds by issuing a check or executing a wire transfer, the money is capable of being the subject of a conversion action.

Based upon the foregoing analysis, this Court concludes that the Bankruptcy

Court did not err when it denied National Union's and Van Buerden's motions for summary judgment. Therefore, Cananwill may appropriately proceed against National Union and Van Buerden on a conversion claim.

C. *EMAR's Motion for Partial Summary Judgment as to Cananwill's Claims That EMAR Made Certain Misrepresentations About, and Fraudulently Concealed Certain Material Terms Of, the Insurance Policy Issued to Pilot Freight (Counts Four and Six)*

As noted previously, in count four Cananwill alleges that EMAR and National Union made certain misrepresentations to Cananwill with respect to the nature of the Pilot Freight insurance policy, (Am. & Restated Compl. ¶¶ 73–80), and in count six Cananwill alleges that EMAR fraudulently concealed from Cananwill certain materials terms of the Pilot Freight insurance policies, (*id.* at ¶¶ 87–102).

With its motion in the Bankruptcy Court, EMAR sought partial summary judgment as to counts four and six on the ground that, to the extent that Cananwill is seeking damages for the potential loss of $1,053,120, EMAR's alleged misrepresentations and fraudulent concealment did not proximately cause the alleged conversion of funds by National Union and Van Buerden. With this appeal, EMAR argues that the Bankruptcy Court erred when it denied the partial summary judgment motion since there is no genuine issue of material fact and, as a matter of law, EMAR's alleged misrepresentations and alleged fraudulent concealment did not proximately cause any loss suffered by Cananwill relating to the $1,053,120 refund by National Union. (Case 2:97CV00338, Br. of

Defs. EMAR Group, Inc. and Walsh Group, Inc. at 17–19.) Cananwill has filed a response in opposition.

Before addressing the causation issue, however, the Court will discuss EMAR's contention, previously set forth in section VI.A. of this Memorandum Opinion, that the Pilot Freight insurance policy is unenforceable as a matter of public policy. In connection with the appeal cited above and the denial of its own motion for partial summary judgment by the Bankruptcy Court, EMAR contends that the Pilot Freight insurance policy should be deemed unenforceable because National Union failed to make certain state regulatory filings with respect to the policy. (*Id.* at 6–16.) EMAR makes such an argument primarily because if the contract is unenforceable then EMAR's alleged statements to Cananwill—to wit, that retrospective rating provisions would not apply to the insurance policy—could be viewed, in effect, as truthful and accurate representations.[16] The Trustee and Cananwill have aligned with EMAR in this regard, since they also seek to nullify the retrospective rating provisions of the Pilot Freight policy.[17] National Union has filed a response in opposition. This Court will address the question of enforceability prior to discussing the loss causation issue.

1. Enforceability of the Retrospectively Rated Insurance Policy

■ The Court's discussion of the enforceability issue is driven by the reasoned conclusion that there was no integration with respect to the Standard Policy and, in turn, the insurance policy executed by the parties included retrospective rating provisions. The Court, however, has also previously noted that National Union failed to comply with certain provisions of state law.

16. However, it is not necessarily clear whether EMAR—at the time it made representations to Cananwill—was relying upon its current contention that the retrospective rating provisions of the Pilot Freight insurance policy were unenforceable because National Union failed to comply with state regulations.

17. The Trustee's and Cananwill's support for EMAR's position is set forth in their brief opposing EMAR's appeal of the Bankruptcy Court's denial of its motion for partial summary judgment.

For example, National Union did not file the insurance contract and related forms with the North Carolina Commissioner of Insurance prior to the issuance of the policy to the insured, as is required by North Carolina law. N.C.Gen.Stat. §§ 58–3–150(a), 58–36–55. Anticipating the possibility that this Court would conclude that the insurance policy was retrospectively rated, EMAR has argued that the policy should nevertheless be deemed unenforceable because National Union failed to make such filings. National Union primarily contends that its failure to comply with various state regulatory provisions does not render the insurance contract unenforceable but, rather, exposes the insurance company to regulatory penalties. (Case 2:97CV00338, Resp. Br. of Appellee National Union at 6–20.) This Court agrees with National Union's position with respect to this issue.

The Pilot Freight insurance policy covered workers driving in multiple states. At the time the policy was issued, most of these states required insurance companies to file their workers' compensation insurance plans with, and obtain approval from, state regulators before contracting with the insured. *See, e.g.,* N.Y. Ins.Law § 2305 (requiring prior approval of workers' compensation insurance rates, rating plans, rating rules, and rate manuals by the superintendent). It is undisputed that National Union failed to comply with these various state laws in connection with the Pilot Freight insurance policy. Based on these violations, EMAR asserts that the insurance policy is unenforceable as a matter of public policy. (Case 2:97CV00338, Br. of Defs. EMAR Group, Inc. and Walsh Group, Inc. at 12–16.)

In support of its argument, EMAR sets forth what it contends are relevant North Carolina statutes as an example of a "typical" insurance premium regulatory scheme. (*Id.* at 9.) National Union, citing sections 58–36–1(3)[18] and 97–93[19] of the North Carolina General Statutes, argues that it was not required to comply with North Carolina provisions because Pilot Freight was "self-insured" in North Carolina.[20] (Case 2:97CV00338, Resp.Br. of National Union at 5–6.) Although Pilot Freight may have been self-insured in North Carolina, this Court will nonetheless examine the North Carolina regulatory scheme to determine whether a failure to

**18.** Section 58–36–1(3) provides in pertinent part:

> The [North Carolina Rate] Bureau shall have the duty and responsibility of promulgating and proposing rates ..., as provided in G.S. 58–36–100, for loss costs and residual market rate filings for workers' compensation ... insurance written in connection therewith.... The Bureau shall have no jurisdiction over excess workers' compensation insurance for employers qualifying as self-insurers as provided in G.S. 97–93....

N.C.Gen.Stat. § 58–36–1(3).

**19.** Section 97–93 provides in pertinent part:

> (a) Every employer subject to the provisions of this Article [Workers' Compensation Act] relative to the payment of compensation shall either:
>> (1) Insure and keep insured his liability under this Article in any authorized corporation, association, organization, or in any mutual insurance association formed by a group of employers so authorized; or
>> ...
>> (3) Obtain a license from the Commissioner of Insurance under Article 5 of this Chapter or under Article 47 of Chapter 58 of the General Statutes.
>
> ...
>
> (e) Every employer who is in compliance with the provisions of subsection (a) of this section shall post in a conspicuous place in places of employment a notice stating that employment by this employer is subject to the North Carolina Workers' Compensation Act and stating whether the employer has a policy of insurance against liability or qualifies as a self-insured employer. In the event the employer allows its insurance to lapse or ceases to qualify as a self-insured employer, the employer shall, within five working days of this occurrence, remove any notices indicating otherwise.

N.C.Gen.Stat. § 97–93.

**20.** National Union, however, does concede that it was required to comply with regulations of other states.

comply therewith renders an insurance policy unenforceable as a matter of public policy. The Court will examine the North Carolina laws because (1) this Court has previously determined that the Pilot Freight insurance policy was "made" in North Carolina and (2) EMAR contends that the North Carolina scheme is "typical" or representative of other states' schemes.

As the Supreme Court of North Carolina has noted,

[t]he general rule is that an agreement which violates a constitutional statute or municipal ordinance is illegal and void. However, there is also ample authority that the statutory imposition of a penalty, without more, will not invariably avoid a contract which contravenes a statute or ordinance when the agreement or contract is not immoral or criminal in itself. In such cases the Courts may examine the language and purposes of the statute, as well as the effects of avoiding contracts in violation thereof, and restrict the penalty for violation solely to that expressed within the statute itself.

*Marriott Fin. Servs., Inc. v. Capitol Funds, Inc.*, 288 N.C. 122, 128, 217 S.E.2d 551, 555–56 (1975) (citations omitted); *see also St. Paul Mercury Ins. Co. v. Duke Univ.*, 849 F.2d 133, 135 (4th Cir.1988) ("The power to refuse to enforce contracts on the ground of public policy is ... limited to occasions where the contract would violate 'some explicit public policy' that is 'well defined and dominant, and [which] is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." ' ") (second alteration in original) (citations omitted). As noted previously, National Union asserts that its failure to comply with state filing provisions should not render the Pilot Freight contract illegal or void. In support of its position, National Union cites *Chief Auto Parts, Inc. v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania*, 871 F.Supp. 915 (N.D.Tex.1994).

In *Chief Auto Parts*, the plaintiff-insured contracted with the defendant-insurance company to receive retrospectively rated workers' compensation coverage. Although required to do so, the insurance company failed to file a notice of election of a retrospectively rated plan in Texas and failed to file a retrospective premium endorsement in California. Based on retrospective calculations made by the insurance company, the insured was required to pay additional premiums. As a result, the insured sued the insurance company, seeking the return of these additional payments. The insured, like EMAR in the present action, contended that, since the insurance company failed to file the notices required by Texas and California state law, the insurance contracts could not be retrospectively rated. The district court rejected this contention on two grounds.

First, the district court examined the Texas and California regulations with which the insurance company failed to comply and noted that "the plain meaning of the[ ] regulations d[id] not require an insurer to automatically void the retrospective rating aspects of a policy and refund any additional premiums paid when the insurer fails to file a notice of election." *Id.* at 917. Since the regulations themselves did not render unenforceable the retrospective rating features of the insurance policies at issue, the court concluded that for it to do so would "impinge upon the parties' common law right to freedom of contract." *Id.* Second, the district court observed that "the undisputed purpose of the regulations is to be certain that the insured is aware of the kind of coverage that it has actually purchased." *Id.* Since the insured conceded that it intended to purchase a retrospectively rated plan, the court found that it was "clear that [the insurance company]'s failure to comply with the regulations d[id] not implicate the purpose of the filing requirements." *Id.* This Court finds these two reasons persua-

sive as the facts of the present case are considered.

In this instance, EMAR contends in its brief that National Union's actions with respect to the Pilot Freight insurance policy were "prohibited" by sections 58–3–150(a), 58–36–30, and 58–36–55 of the North Carolina General Statutes. (Case 2:97CV00338, Br. of Defs. EMAR Group, Inc. and Walsh Group, Inc. at 9.) None of these sections, however, specify that failure to comply renders the insurance policy or relevant provision "unenforceable." Section 58–3–150(a) declares it "unlawful" for insurance companies to do business in North Carolina. without first submitting forms to the Commissioner of Insurance for approval. N.C.Gen.Stat. § 58–3–150(a). Sections 58–36–30 and 58–36–55, which prohibit certain rate deviations and policy forms, respectively, do not indicate that unapproved rate deviations or policy forms are either unlawful or unenforceable. N.C.Gen.Stat. §§ 58–36–30 and 58–36–55. In contrast, the state legislature has specifically provided in other regulatory provisions that noncompliance with the statute renders the agreement or clause at issue "void" or "unenforceable." *E.g.*, N.C.Gen.Stat. § 58–3–15 (clauses or provisions requiring insured to take or maintain larger amounts of insurance than expressed in policy or providing that insured is liable as coinsurer with insurance company are "null and void, and of no effect"); N.C.Gen.Stat. § 58–3–35 (conditions or stipulations in insurance contracts concerning jurisdiction or limitation of actions are "void"); N.C.Gen.Stat. § 22B–1 (construction indemnity agreements are

"against public policy and [are] void and unenforceable;")[21] N.C.Gen.Stat. § 14–291.2(d) (contracts created in which part of the consideration consists of the opportunity to participate in pyramid scheme are "contrary to public policy and therefore void and unenforceable"); N.C.Gen.Stat. § 95–98 (contracts between government units and labor organizations are "against ... public policy ..., illegal, unlawful, void and of no effect"); *see also Home Indem. Co. v. Hoechst Celanese Corp.*, 128 N.C.App. 226, 494 S.E.2d 768, *rev. denied*, 348 N.C. 72, 505 S.E.2d 869 (1998) (insurer's absolute exclusions not rendered void despite failure to have forms approved by state; statute violated did not declare unapproved policy provisions void or unenforceable).[22] Thus, it is apparent that the legislature did not intend for the courts to render insurance contracts unenforceable when the insurance company issuing the policy has failed to comply with state approval provisions.

Moreover, at oral argument, the parties acknowledged that a primary purpose of the regulations at issue is notice to the insured. It is undisputed that Pilot Freight intended to enter into a retrospectively rated insurance agreement and was aware that it had obtained such a policy. As such, National Union's failure to comply with the various filing requirements did not implicate a primary purpose of those provisions, to wit, notice to the insured that it is entering into a retrospectively rated agreement.

The Court notes that insurance companies may not violate state regulatory provisions without risk. Most states' laws au-

---

**21.** The Court recognizes that section 22B–1 of the North Carolina General Statutes also provides that "[t]his section shall not affect an insurance contract, workers' compensation, or any other agreement issued by an insurer...." N.C.Gen.Stat. § 22B–1. However, the Court cites the section not for its substantive applicability but, rather, as just another example of how the state legislature has in the past chosen to manifest its intent to render agreements unenforceable.

**22.** Although EMAR cites *Smathers v. Bankers' Life Insurance Co.*, 151 N.C. 98, 65 S.E. 746 (1909), in support of its position, that case—which has not been cited by a North Carolina court since 1924—is factually distinguishable. In *Smathers*, the defendant-insurance company failed to perform on its obligations under the agreement. Here, National Union—despite its noncompliance with certain state laws—fully performed under the Pilot Freight insurance policy.

thorize the assessment of penalties and other regulatory punishment if a violation is found. The penalties and punishment are not to be minimized. For instance, a violation of North Carolina's insurance laws could result, at a minimum, in the revocation of the insurance company's license. N.C.Gen.Stat. § 58–3–100(a)(1). Such enforcement, however, is within the province of the state. As the court in *Chief Auto Parts* observed, "to allow [the insured] to rely upon the regulations to entitle it to a refund of additional premiums paid would be to grant [the insured] a windfall." *Chief Auto Parts*, 871 F.Supp. at 917.[23]

Based upon the foregoing analysis, this Court concludes that, in this instance, the failure of National Union to comply with state regulatory provisions does not render the Pilot Freight insurance policy unenforceable.

2. Loss Causation

■ As noted previously, EMAR also sought partial summary judgment in the Bankruptcy Court as to counts four and six on the ground that, to the extent that Cananwill is seeking damages for the potential loss of $1,053,120, EMAR's alleged misrepresentations and fraudulent concealment did not proximately cause the alleged conversion of funds by National Union and Van Buerden. With this appeal, EMAR argues that the Bankruptcy Court erred when it denied the partial summary judgment motion as to counts four and six. Specifically, EMAR contends that the required causation is not present because Van Buerden's involvement as Pilot Freight's broker of record and the subsequent negotiation and receipt of the refund constituted an independent intervening

cause. (Case 2:97CV00338, Br. of Defs. EMAR Group, Inc. and Walsh Group, Inc. at 17–19.) In response, Cananwill contends that (1) it was foreseeable to EMAR that National Union would have issued a refund to Pilot Freight and, regardless, (2) the question of loss causation is one for the jury. (Case 2:97CV00338, Joint Br. of Pls. in Resp. to the Appeal of EMAR Group, Inc. and Walsh Group, Inc. at 5–8.)

As set forth previously, EMAR assisted Pilot Freight in obtaining premium financing for its workers' compensation insurance with National Union. This assistance included discussions with Cananwill about the nature of the insurance policy agreed to between Pilot Freight and National Union. Cananwill contends that during the course of those discussions, EMAR made certain negligent misrepresentations about, and fraudulently concealed material terms of, the insurance policy (e.g., asserting that is was not retrospectively rated when, in fact, the parties to the policy intended it to be retrospectively rated). Pilot Freight entered into the Premium Finance Agreement on October 12, 1988, and Cananwill loaned Pilot Freight $5,361,811 pursuant to that arrangement. Soon thereafter and prior to January 1989, Pilot Freight removed EMAR as its insurance broker of record and began using the services of Van Buerden. In January 1989, Van Buerden negotiated a reduction in the amount of Premium Guarantees held by National Union. On or about February 15, 1989, National Union processed the $1,053,120 refund.

The $1,053,120 represents a portion of the damages sought from EMAR by Cananwill pursuant to counts four and six. Cananwill contends that EMAR "should

---

**23.** EMAR asserts that *Wal–Mart Stores, Inc. v. Crist*, 855 F.2d 1326 (8th Cir.1988), compels the opposite conclusion. This Court disagrees. In *Wal–Mart Stores* the insurance company knowingly misrepresented the payroll estimates of the insured in an attempt to deceive the state; the policy was illegal on its face and neither party had agreed to its terms. Here, it is undisputed that all of the parties involved had agreed to a retrospectively rated policy, and the relevant documents confirmed that arrangement. Although National Union's underwriter testified that National Union filed schedules with state regulators that did not reflect retrospective rating, this Court finds that these omissions do not rise to the level of illegality and deception present in *Wal–Mart Stores*.

have reasonably foreseen the type of events that led to a part of Cananwill's damage: the substitution of another broker and a partial refund by National Union." (Case 2:97CV00338, Joint Br. of Pls. in Resp. to the Appeal of EMAR Group, Inc. and Walsh Group, Inc. at 7.) EMAR contends that, as a matter of law, such damages were not proximately caused by the statements made in connection with the execution of the Premium Finance Agreement. This Court agrees.

"The requirement of proving loss causation is a general requirement of tort law." *Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 763 (7th Cir.1998). When the tort complained of involves misrepresentations or omissions, loss causation requires a showing "that [such] misrepresentations or omissions caused the economic harm...." *Gasner v. Board of Supervisors*, 103 F.3d 351, 360 (4th Cir. 1996).

Cananwill alleges that EMAR misrepresented the nature of the Pilot Freight insurance policy, to the extent that EMAR represented to Cananwill that the policy was not retrospectively rated. Cananwill argues that "but for the ... [r]epresentations, Cananwill would not have made the loan to Pilot [Freight]." (Case 2:97CV00338, Joint Br. of Pls. in Resp. to the Appeal of EMAR Group, Inc. and Walsh Group, Inc. at 6.) Cananwill further contends that "if [it] had not made the loan, it would not have suffered any damage due to the [r]efund." (*Id.*) EMAR concedes that such "but for" or "transaction" causation is present. As to the issue of loss causation, the question before the Court—in light of the standard set forth by *Gasner*—is whether the alleged misrepresentations and fraudulent concealment by EMAR at the inception of Cananwill's agreement to make a loan to Pilot

Freight "caused" the ultimate refund to Pilot Freight by National Union and Van Buerden.

Here, the Court finds that the required loss causation is not present. First, it was the actions of Van Buerden, at the direction of Pilot Freight, and not the retrospective nature of the policy that caused the refund. Van Buerden is not affiliated with EMAR in any manner, and EMAR had no role in the negotiation or processing of the refund. Second, the fact that the Pilot Freight insurance policy was retrospectively rated had little to do with the alleged conversion. Pilot Freight, through a broker or agent such as Van Buerden, would have been at liberty to negotiate a refund from National Union even if the policy was not retrospectively rated. The foreseeability of this action is not the type to justify the loss causation that Cananwill seeks to establish to tie the alleged misrepresentations about, and fraudulent concealment of, the retrospective terms of the insurance policy to the transfer of the funds to Pilot Freight.[24] Thus, this Court, upon a *de novo* review, concludes EMAR's motion for partial summary judgment as to counts four and six should be granted and further concludes that the Bankruptcy Court erred in failing to do so.

D. *EMAR's Motion for Summary Judgment as to National Union's Cross-claim That EMAR, as the Broker of Record for Pilot Freight, EMAR Had a Duty to National Union to See That the Insurance Policies Met the Terms of the Revised Proposals Accepted by Pilot Freight*

As noted previously, National Union has asserted a cross-claim against EMAR, contending that, as the broker of record for

---

**24.** Although Cananwill asserts that loss causation is ordinarily a question of fact for the jury, when reasonable minds could not differ about such issues they become questions to be decided by a court. *Williams v. Carolina*

*Power & Light Co.*, 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979). As explained further above, there is no question that EMAR did not "cause" the $1,053,120 refund.

Pilot Freight, EMAR had a duty to National Union to see that the insurance policies met the terms of the revised proposals accepted by Pilot Freight. This cross-claim is driven by count one of the Amended and Restated Complaint in which the Trustee asserts that the Pilot Freight insurance policy was not retrospectively rated. Since this Court has concluded that the Pilot Freight insurance policy *was* retrospectively rated and, in turn, National Union is not required to turnover alleged unearned premiums in the amount of $2,630,153, National Union's cross-claim should be dismissed.[25]

In light of this Court's other conclusions set forth in this Memorandum Opinion, this Court concludes, upon a *de novo* review, that EMAR's motion for summary judgment as to National Union's cross-claim should be granted and that, thus, the Bankruptcy Court erred when it failed to do so.

## VII. SUMMARY OF RULINGS

To summarize, the Court finds upon a *de novo* review that National Union's motion for partial summary judgment as to count one should be granted. The Bankruptcy Court therefore erred when it denied the motion for partial summary judgment. Thus, to the extent that National Union is required to turnover funds to the Trustee, those funds shall be calculated consistent with this Court's finding that the insurance policy was retrospectively rated.

The Court further finds, however, that the Bankruptcy Court was not in error in denying National Union's and Van Buerden's motions for summary judgment as to count three based on their assertion that commingling operates as an absolute bar to a conversion claim. This Court finds

upon a *de novo* review that Cananwill's conversion claim is not barred on the basis that the funds were commingled prior to the refund.

With respect to EMAR's motion for partial summary judgment as to counts four and six based on its argument that loss causation with respect to the $1,053,120 refund could not be established, the Court finds that EMAR's motion should be granted. Thus, to the extent that Cananwill prevails on its negligent misrepresentation and fraud claims against EMAR, damages shall not include any loss attributable to the alleged conversion of the $1,053,120 refund.

Lastly, this Court finds upon a *de novo* review that, as a result of the Court's finding that the Pilot Freight insurance policy was retrospectively rated, EMAR's motion for summary judgment as to National Union's cross-claim should be granted. The Bankruptcy Court therefore erred when it denied the motion for summary judgment.

## VIII. CONCLUSION

Since this Court, pursuant to 28 U.S.C. § 157(d), has withdrawn the prior reference to the Bankruptcy Court, the parties are directed to brief, within 20 days of this Memorandum Opinion, their respective positions as to the procedural posture of any pending matters in this case in light of the above rulings.

---

25. National Union's cross-claim does not involve the $1,053,120 refund that Cananwill contends was converted by National Union and Van Buerden. The $2,630,153 figure, as discussed earlier in this Memorandum Opinion, is the difference between earned premiums calculated based upon an interpretation that the Pilot Freight insurance policy was *not*

retrospectively rated ($1,462,978) and earned premiums calculated based upon an interpretation that the Pilot Freight insurance policy *was* retrospectively rated ($3,600,787). However, the disbursement of the $1,053,120 refund from National Union is not a component of these calculations and, thus, the $1,053,120 amount is unrelated to the $2,630,153 figure.