Tanger Props. Ltd. P'ship v. ACE Am. Ins. Co., 2025 NCBC 66.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV005614-400

TANGER PROPERTIES LIMITED
PARTNERSHIP,

                    Plaintiff,

v.

ACE AMERICAN INSURANCE
COMPANY and LIBERTY MUTUAL
FIRE INSURANCE COMPANY,

                    Defendants.

**ORDER AND OPINION ON
DEFENDANTS' JOINT MOTION TO
DISMISS**

**THIS MATTER** is before the Court on Defendants ACE American Insurance Company ("ACE") and Liberty Mutual Fire Insurance Company's ("Liberty Mutual") (collectively, "Defendants"), Joint Motion to Dismiss the First Amended Complaint for Failure to State a Claim ("Motion to Dismiss," ECF No. 48).

**THE COURT**, having considered the Motion to Dismiss, the parties' briefs, the arguments of counsel, the applicable law, and all appropriate matters of record, **CONCLUDES** that the Motion to Dismiss should be **DENIED** as set forth below.

*Latham & Watkins, LLP, by Sam Barrows and Robert Gilbert; and Robinson, Bradshaw & Hinson, P.A., by Benjamin DeCelle, Richard Worf, and Robert Harrington, for Plaintiff Tanger Properties Limited Partnership.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Jennifer Van Zant, Agustin Martinez, and Gabrielle Supak; and O'Melveny & Meyers, LLP, by Richard Goetz, Andrew Levine, and Zoheb Noorani, for Defendant ACE American Insurance Company.*

*Butler Weihmuller Katz Craig LLP, by Nicholas Goanos; and Robins Kaplan, LLP, by Melissa D'Alelio and Sandra Badin, for Defendant Liberty Mutual Fire Insurance Company.*

Davis, Judge.

## INTRODUCTION

1. This case concerns a coverage dispute between an insured and its insurers over business losses allegedly suffered during the COVID-19 pandemic. In the present Motion, the Court must address a significant choice of law issue, as well as a dispute between the parties as to whether the insured has properly alleged claims against the insurers for bad faith and for unfair and deceptive trade practices.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact in connection with a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached, referred to, or incorporated by reference in the complaint) that are relevant to the Court's determination of the motion. *See, e.g., Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *4, *11 (N.C. Super. Ct. July 12, 2017).

3. Plaintiff Tanger Properties Limited Partnership ("Tanger" or "Plaintiff") is a North Carolina limited partnership with its headquarters and principal place of business in Greensboro, North Carolina. (Am. Compl. ¶ 21, ECF No. 44.)

4. Defendant ACE is a Pennsylvania corporation that provided property insurance coverage under a policy issued to Tanger[1] for the policy period of 1 August 2019 through 1 August 2020. (Am. Compl. ¶¶ 23, 31; "ACE Policy," ECF No. 50.1.)

---

[1] Plaintiff acknowledges that the named insured on ACE's policy is identified as "Tanger Properties LP" but asserts that (1) this was a scrivener's error given that no such entity exists; and (2) Tanger Properties Limited Partnership is the actual named insured under this policy. (Am. Compl. ¶ 21.) Defendants do not appear to dispute Plaintiff's statements.

5.    During the policy period, Tanger owned and operated thirty-nine outlet centers located across twenty states, all of which were covered under the ACE Policy. (Am. Compl. ¶ 29; ACE Policy § 1.)  From its headquarters in North Carolina, Tanger "own[ed], operate[d] and manage[d]" all of its locations.  (Am. Compl. ¶ 48.)

6.    Defendant Liberty Mutual is an insurance company organized under the laws of the Commonwealth of Massachusetts.  (Am. Compl. ¶ 24.)  Liberty Mutual provided insurance coverage to Tanger in the form of an excess policy during the same policy period as ACE that likewise encompassed Tanger's thirty-nine outlet centers. (Am. Compl. ¶ 45; "Liberty Policy," ECF No. 50.2.)

7.    Liberty Mutual's policy is identical in all material respects to the ACE Policy with regard to the terms and conditions contained therein.  (Am. Compl. ¶ 45.)[2]

8.    The Policies are "all-risk" policies, insuring "against all risks of direct physical loss of or damage to property described herein [.]"  (ACE Policy § 23; Liberty Policy § 23; Am. Compl. ¶ 32.)

9.    The Policies do not contain a choice of law provision identifying which state's substantive law should apply to coverage disputes.  They do, however, include a provision stating that "the Insurer, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will

---

[2] The Court will refer to the ACE policy and the Liberty Mutual policy throughout this Opinion collectively as the "Policies."

comply with all requirements necessary to give such jurisdiction." (ACE Policy § 62; Liberty Policy § 62.)[3]

10. In late 2019 or early 2020, the SARS-CoV-2 virus was identified in China as the cause of a respiratory illness now known as COVID-19. (Am. Compl. ¶ 55.) The virus was transmitted by human-to-human contact, airborne particles, and contact with infected surfaces. (Am. Compl. ¶ 58.) There was a belief that the virus could be detected on surfaces weeks after exposure. (Am. Compl. ¶ 70.) As a result, Tanger alleges, the virus was capable of causing physical damage to property. (Am. Compl. ¶ 73.)

11. In early 2020, the virus began spreading around the globe, causing hundreds of millions of infections and resulting in a global pandemic. (Am. Compl. ¶ 56.)

12. As a result of the virus's spread, Tanger asserts, governmental entities (including states, counties, and municipalities) issued various orders restricting business activities and gatherings. (Am. Compl. ¶¶ 54, 57.) These orders, among other things, mandated the closing of some businesses and limited the activities of others (1) where the presence of the virus had been confirmed at the business' location, or (2) the business was located in geographical proximity to an area that had experienced the presence of COVID-19. (Am. Compl. ¶ 57(a)(i), (iii).) Furthermore, some of these orders required businesses deemed non-essential—including shopping

---

[3] The Policies also contain a provision (discussed later in this Opinion) stating that Florida law provides the applicable limitations period for claims arising under the Policies.

centers and retail stores—to close their business or at least limit their activities. (Am. Compl. ¶ 57(a)(ii).)

13. Tanger responded to these orders by taking the following actions: (1) remediating or replacing physical property adversely altered by the virus; (2) temporarily shutting down its locations due to either the virus or the presence of the resulting disease; (3) suspending business activities due to business premises being deemed unreasonably dangerous; (4) taking on extra expenses and costs to remain operational during the pandemic; and (5) incurring both logistical and claims preparation costs. (Am. Compl. ¶ 57(b).)

14. Tanger alleges that, as a result of these actions, it incurred (1) loss or damage to property and direct business interruption losses; (2) lost rental value/income; (3) losses due to compliance with orders of civil authority; (4) losses due to prevention of ingress or egress; and (5) loss adjustment expenses. (Am. Compl. ¶¶ 75–76, 79–127.)

15. Tanger provided an initial notice of loss to Defendants on 7 April 2020. (Am. Compl. ¶ 128.) On 2 October 2020, ACE requested additional information. ("Tanger Demand Letter" at 1, ECF No. 50.3.) Tanger provided an initial proof of loss form on 4 December 2020 in which it noted that losses were still being assessed and remained ongoing due to the continuation of the pandemic. (Am. Compl. ¶ 129; Tanger Demand Letter at 1.) Tanger further stated that all thirty-eight[4] of the outlet

---

[4] The Court notes that Plaintiff alleges in the Amended Complaint that it owned thirty-*nine* outlet stores. (Am. Compl. ¶ 29.)

centers it owned in the United States had experienced losses covered under the Policies. (Tanger Demand Letter at 1.)

16. In response to supplemental requests from ACE, Tanger provided an additional proof of loss form on 7 May 2021. (Am. Compl. ¶ 129.)

17. On 30 June 2021, ACE denied coverage based on its position that Tanger had not established any direct physical loss or damage to property and that the coverage claimed was excluded by the Policies. (Am. Compl. ¶ 130; Defs.' Supp. Br., Exhibit 1, ECF No. 61.1.) Liberty Mutual similarly denied coverage. (Am. Compl. ¶ 130.)

18. On 13 December 2024, the Supreme Court of North Carolina issued its opinion in *North State Deli, LLC v. Cincinnati Insurance Co.*, 386 N.C. 733 (2024), in which it held that under an all-risk policy with no virus exclusion, "a reasonable person in the position of the insured would understand the [businesses'] policies to include coverage for business income lost when virus-related government orders deprived the policyholder [businesses] of their ability to physically use and physically operate property at their insured business premises." *Id*. at 746.

19. Tanger contends that any possible doubt previously existing as to whether the claims it submitted to Defendants were covered under the Policies was erased by the decision in *North State Deli*.

20. Following the Supreme Court's issuance of its opinion in *North State Deli*, Tanger initiated this action by filing a Complaint in Guilford County Superior Court

on 12 March 2025 in which it challenged Defendants' denial of coverage by asserting claims for declaratory relief and breach of contract against them. (ECF No. 3.)

21. The case was subsequently designated to the Business Court and assigned to the Honorable Julianna Theall Earp. (ECF Nos. 1–2.)

22. Following the filing of the Complaint, Tanger sent a renewed demand letter to ACE on 23 April 2025 and to Liberty Mutual on 24 April 2025 requesting that Defendants reconsider their prior denial of coverage based on *North State Deli*. (Am. Compl. ¶ 131.)

23. On 24 April 2025, Liberty Mutual acknowledged receipt of Tanger's letter and subsequently stated via email on 23 May 2025 that it would respond to the issues raised therein in the course of defending this lawsuit. (Am. Compl. ¶¶ 133–34.)[5]

24. This case was reassigned to the undersigned on 9 May 2025. (ECF No. 41.)

25. On 27 May 2025, Tanger filed its First Amended Complaint, which added claims for breach of the implied covenant of good faith and fair dealing and for unfair and deceptive trade practices based on its contention that Defendants had violated North Carolina's Unfair Claims Settlement Practices Act, N.C.G.S. § 58-63-15(11). (Am. Compl. ¶¶ 132, 135, 153–72.)

26. Defendants filed the present Motion to Dismiss on 26 June 2025. (ECF No. 48.)

---

[5] Although Tanger asserts in its Amended Complaint that ACE failed to respond to Tanger's 23 April letter, Tanger subsequently conceded in its briefing that ACE did, in fact, reply on 22 May 2025 by stating that ACE would likewise be addressing Tanger's renewed demand in its defense of the present lawsuit. (Pl.'s Supp. Br. at 3, n.1, ECF No. 62.)

27. A hearing was held on 3 September 2025 at which all parties were represented by counsel. (*See* ECF No. 57.)

28. Following the hearing, the Court requested supplemental briefing on certain issues, and the parties filed their supplemental briefs on 17 September 2025. (ECF Nos. 60, 62.)

29. The Motion to Dismiss is now ripe for resolution.

## LEGAL STANDARD

30. In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the complaint and "any exhibits attached to the complaint[,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), in order to determine whether "as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some recognized legal theory[,]" *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (cleaned up). The Court must view the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (citation omitted).

31. "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citations and internal quotations omitted).

## ANALYSIS

32. In the Motion to Dismiss, Defendants seek dismissal of all claims asserted against them in the Amended Complaint. The Court will address each of their arguments in turn.

## I. Breach of Contract and Declaratory Judgment

33. Tanger asserts that ACE and Liberty Mutual breached the Policies by failing to cover "the losses that it incurred as a consequence of the COVID-19 pandemic." (Am. Compl. ¶ 146.) Tanger further requests a declaration that the injuries it suffered during the pandemic constitute a covered loss under the Policies. (Am. Compl. ¶ 140.) Thus, each of these claims is based on Tanger's contention that Defendants wrongfully denied coverage for its claims under the Policies.

34. The parties' arguments regarding these two claims in connection with the Motion to Dismiss are focused on the issue of whether North Carolina law (as opposed to the law of some other state) is applicable to the interpretation of the Policies. The choice of law issue is of great importance here because—as Defendants assert and Tanger does not dispute—North Carolina is the only jurisdiction across the country whose courts have interpreted similar policy provisions as providing coverage for the type of claims asserted by Tanger in this case.[6]

35. Generally, when addressing conflict of law issues applicable to contracts, North Carolina courts follow the principle of *lex loci contractus*, which "mandates that

---

[6] Nevertheless, Defendants make clear in their briefs that they are reserving their right to argue at a later stage of this litigation, if necessary, that even under North Carolina law no coverage actually exists under the Policies for Tanger's claims.

the substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract." *Fortune Ins. Co. v. Owens*, 351 N.C. 424, 428 (2000) (citing *Roomy v. Allstate Ins. Co.*, 256 N.C. 318, 322 (1962)).

36.     Defendants contend that under the *lex loci contractus* doctrine Georgia law applies to the interpretation of the Policies because the last act necessary to form a contract in this case was the delivery of the Policies to Tanger's broker, which occurred in Atlanta, Georgia.

37.     Tanger disputes Defendants' assertion that the last act required to form a contract occurred in Georgia.  However, it contends that the Court need not reach that issue because of the statutory exception to *lex loci contractus* that exists under North Carolina law for certain types of insurance-related disputes.  Pursuant to N.C.G.S. § 58-3-1:

> All contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof.

N.C.G.S. § 58-3-1.

38.     Critically, however, our Supreme Court has held that in order for the application of N.C.G.S. § 58-3-1 to comport with principles of due process, there must be "a close connection [] between this State and the interests insured by [the] insurance policy." *Fortune*, 351 N.C. at 428; *see Collins & Aikman Corp. v. Hartford Accident & Indem. Co.*, 335 N.C. 91, 95 (1993) ("North Carolina has a close connection with the interests insured in this case. N.C.G.S. § 58-3-1 clearly means that the law

of North Carolina applies and we do not believe the United States Constitution prohibits it.").

39.    Defendants contend that the application of North Carolina law here would offend due process because the requisite close connection between the property insured by the Policies and North Carolina is lacking.  In making this argument, Defendants primarily rely on the fact that (1) only two of the thirty-nine outlet centers at issue that are owned or operated by Tanger are located in North Carolina; and (2) the remaining thirty-seven are located in nineteen different states across the country.

40.    Defendants further submit that the resulting due process violation would be compounded by the fact that the Supreme Court of North Carolina is the only appellate court in the nation to have ruled that coverage for pandemic-related business losses exists under the type of insurance policies at issue here.

41.    In *American Realty Advisors v. Lexington Insurance Co.*, 2019 NCBC LEXIS 59 (N.C. Super. Ct. Sep. 10, 2019), this Court articulated a series of factors that are relevant to the issue of whether a close connection exists in this context. These factors include (1) the extent of the insured's operations/contacts in North Carolina; (2) whether the policy is a commercial policy; (3) the insurer's awareness that it is insuring a North Carolina company; (4) whether the insurance policy contains a choice of law provision; and (5) whether the insurer is registered to do business in North Carolina.  *Id.* at *8–12.

42.    The first (and primary) factor is the extent and quality of the operations of the insured in North Carolina.

43.     Tanger points to the fact that its headquarters is located in Greensboro. Indeed, two federal courts assessing an insured's contacts with North Carolina for this purpose have placed significant weight on the fact that the insured was headquartered in this State. *See, e.g., United Nat. Ins. Co. v. Horton Sales Dev. Corp.*, 2012 U.S. Dist. LEXIS 176772, at *11 (W.D.N.C. Dec. 12, 2012) ("[T]he interest protected by this policy, a liability insurance policy, covers the contractual liability of Horton Sales Development Corp., a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Henderson County, North Carolina . . . . Since Horton Sales Development Corp. is a resident of North Carolina, with its headquarters in this State, it has a 'substantial connection' to this State."); *Cananwill, Inc. v. Emar Grp., Inc.*, 250 B.R. 533, 546 (Bankr. M.D.N.C. 1999) (finding that "the extent of Pilot Freight's presence in the state (i.e., headquartered in Winston-Salem, North Carolina) at the time the insurance policy was issued constitutes a sufficient connection with the [S]tate").

44.     Furthermore, although Defendants place great weight on the fact that the majority of the affected outlets owned or operated by Tanger are located outside North Carolina, several courts applying North Carolina law have held that a sufficiently close connection existed for purposes of N.C.G.S. § 58-3-1 even though only a limited portion of the insured property at issue was present in this State.

45.     For example, in *Continental Casualty Co. v. Physicians Weight Loss Centers of America*, 61 Fed. Appx. 841 (4th Cir. 2003), a litigant brought a class action against an Ohio-based company in North Carolina state court based on damages she

sustained at the company's franchise in North Carolina. *Id.* at 843. The company

sought coverage from its insurer under a policy that covered any damages the

company might become legally obligated to pay due to the provision or withholding

of professional services. *Id.* at 844.

46. One of the disputed issues in the case was whether Ohio law or North

Carolina law applied. The trial court held that under the *lex loci contractus* doctrine

Ohio law was applicable because the policy had been delivered to the company in

Ohio, the company was based in Ohio, and the policy was negotiated in Ohio with an

insurance agency located there. *Id.*

47. On appeal, the Fourth Circuit reversed the trial court's ruling on that

issue, holding that N.C.G.S. § 58-3-1 mandated the application of North Carolina law.

In so holding, the Fourth Circuit reasoned as follows:

> In this case, there is a sufficiently close connection between the interests
> insured by the policy and the state of North Carolina to mandate the
> application of North Carolina law in this case. At the time of trial, four
> of [the company]'s roughly fifty franchises were located in North
> Carolina. Each of the North Carolina franchises serviced a great many
> North Carolina citizens: Suggs' second amended complaint alleges that
> there were roughly 5,000 [of the company's] customers in North Carolina
> between June 1995 and June 2000, and [the insurer] itself estimates
> that there were at least 2,000. In light of these facts, North Carolina
> has much more than a causal connection with the substance of the
> insurance policy, and N.C. Gen. Stat. § 58-3-1 requires that we interpret
> the insurance policy under North Carolina law.

*Id.* at 845 (citations and internal quotation marks omitted); *see also Martin v. Cont'l*

*Ins. Co.*, 123 N.C. App. 650, 656–57 (1996) (finding the existence of a close connection

despite the fact that the insured registered only 17.858% of its inventory of vehicles

in North Carolina).

48.      In *American Realty Advisors*, a Delaware company that owned property in North Carolina brought suit against its insurers after coverage was denied for its claim based on water damage that had occurred on the property.  2019 NCBC LEXIS 59, at *1–4.  The insurers argued that the laws of states other than North Carolina should apply given that the primary insurer was incorporated in Delaware, the policies were applied for and delivered in California, and they became effective upon acceptance by the insurers in Massachusetts.  *Id*. at *6.  This Court nevertheless concluded that North Carolina law applied.

> No single fact is determinative, but cumulatively the facts include that the insurers were aware that they were insuring properties located in various states, including North Carolina, they consented to suit in the various states without requiring a mandatory choice of law provision, the damages for which coverage is sought are based on losses occurring in North Carolina arising from the Property being constructed and operated in North Carolina and housing North Carolina residents, as a result of which facts necessary to determine the cause and extent of the losses will depend largely on documents and witnesses located in North Carolina.

*Id*. at *12.

49.      Here, Tanger is a limited partnership organized under the laws of North Carolina with its headquarters in Greensboro, North Carolina.  (Am. Compl. ¶¶ 1–2.) Furthermore, two of the outlet centers suffering losses are located in this State, and Plaintiff has alleged that Tanger served approximately 1,377,742 customers in North Carolina during the applicable policy period.  (Am. Compl. ¶ 47; Tanger Demand Letter.)  These facts support Tanger's argument that a close connection exists under N.C.G.S. § 58-3-1.

50.     Furthermore, the remaining factors to be considered likewise support Tanger's position. The second relevant factor is "whether the policy is a commercial policy." *Am. Realty Advisors*, 2019 NCBC LEXIS 59, at *10; *see also Foster v. Wilet*, 2016 U.S. Dist. LEXIS 161924, at *5 (W.D.N.C. Nov. 22, 2016) (applying the general conflicts of law rule where the case involved a *non*-commercial insurance policy). Here, the Policies are, in fact, commercial insurance policies. (Am. Compl. ¶ 46.)

51.     Third, with regard to the question of whether the insurer was aware that it was insuring a North Carolina company, Tanger's address as listed in the Policies is its headquarters in Greensboro. (ACE Policy Declarations; Liberty Policy Declarations.)

52.     Fourth, "[a] court may be guided by the absence of a mandatory choice of law provision in a policy providing coverage for interstate operations." *Am. Realty Advisors*, 2019 NCBC LEXIS 59, at *11 (citation omitted). Here, there is no choice of law provision applicable to the resolution of coverage disputes contained in the Policies. (Am. Compl. ¶ 49.) Instead, as noted earlier, the Policies provide that "the Insurer, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such jurisdiction." (ACE Policy § 62; Liberty Policy § 62.) Had Defendants desired the application of a particular state's substantive law, they could have included a choice of law provision in the Policies, but they did not do so.

53.    Finally, this Court noted in *American Realty Advisors* that "an insurer's registration to do business in the forum state may be relevant to whether applying the forum's law is fundamentally fair." 2019 NCBC LEXIS 59, at *12; *see also Allstate Ins. Co. v. Hague*, 499 U.S. 302, 317–18 (1981).  Here, it is undisputed that both ACE and Liberty Mutual are registered to do business in North Carolina.

54.    The two cases (both of which arose from automobile accidents) primarily relied upon by Defendants finding the absence of a close connection with North Carolina are simply not analogous.  In *Fortune*, our Supreme Court held that there was no close connection with North Carolina because the subject insurance policy was issued in Florida, the insured vehicle had a Florida identification number and license plate, the insured driver had a Florida driver's license, and the "only contact between the [defendant's] policy and North Carolina" was the location of the accident.  351 N.C. at 428–29.

55.    Similarly, in *Haugh v. Nationwide Mutual Fire Insurance Co.*, 2014 N.C. App. LEXIS 534 (May 20, 2014) the Court of Appeals found no close connection existed where the plaintiff was a South Carolina resident, the policy was written under South Carolina law, and all the vehicles insured under the policy were titled and registered in South Carolina.  *Id.* at *7.  The only connection to North Carolina was the site of the accident.  *Id.*

56.    Therefore, taking Tanger's allegations as true (as required under the Rule 12(b)(6) standard), the Court concludes that Tanger has sufficiently alleged the existence of a close connection between North Carolina and the interests insured by

the Policies so as to warrant the application of North Carolina law based on N.C.G.S. § 58-3-1.

57.    Therefore, the Motion to Dismiss is **DENIED** as to Tanger's claims for breach of contract and declaratory judgment.[7]

## II. Unfair and Deceptive Trade Practices Act (UDTPA)

58.    Tanger alleges that Defendants are also liable under the UDTPA because they violated the North Carolina Unfair Claims Settlement Act set out in N.C.G.S. § 58-63-15(11) by engaging in unfair claims settlement practices.  (Am. Compl. ¶¶ 166–67.)

59.    The Supreme Court of North Carolina has held that "conduct that violates subsection (f) of N.C.G.S. § 58-63-15(11) constitutes a violation of [the UDTPA], as a matter of law, without the necessity of an additional showing of frequency indicating a general business practice[.]" *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 71 (2000) (internal quotations and citations omitted).  Our Court of Appeals subsequently held that "[i]t follows that the other prohibited acts listed in . . . § 58-63-15(11) are also acts which are unfair, unscrupulous, and injurious to consumers, and that such acts therefore fall within the 'broader standards' of [the UDTPA]." *Country Club of Johnston Cnty., Inc. v. U.S. Fid. & Guar. Co.*, 150 N.C. App. 231, 246 (2002).

---

[7] Having ruled on the choice of law issue (the only issue thoroughly briefed by the parties as to Tanger's breach of contract and declaratory judgment claims), the Court need not—and does not—proceed to engage in an analysis of whether, or to what extent, coverage for Tanger's losses actually exists under the Policies based on the application of North Carolina law.  That determination must await additional briefing by the parties and a more fully developed factual record.

60.     Specifically, Tanger alleges that Defendants violated the following subparts of N.C.G.S. § 58-63-15(11):

a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

b. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

d. Refusing to pay claims without conducting a reasonable investigation based upon all available information;

. . .

f. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

g. Compelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured; [and]

. . .

n. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

N.C.G.S. § 58-63-15(11) (a)–(d), (f)–(g), (n).

61.     At the 3 September hearing, Plaintiff's counsel clarified that Tanger's UDTPA claim is based not on Defendants' *original* denial of coverage but rather on Defendants' refusal to *reconsider* their earlier denial after the *North State Deli* decision was issued by our Supreme Court. Although acknowledging that it initiated the present lawsuit prior to demanding that Defendants reconsider their prior denial

of coverage, Tanger maintains that Defendants still had a duty to respond to its request for reconsideration either by admitting coverage or by providing a full written explanation as to why they continued to deny coverage despite the decision in *North State Deli*.

62. Defendants, conversely, take the position that no liability under N.C.G.S. § 58-63-15(11) can exist stemming from their refusal to reconsider (post-*North State Deli*) their prior denial of coverage because by that point the present litigation had already been initiated by Tanger. As a result, Defendants argue, they were legally permitted to simply allow their litigation counsel to address the effects of *North State Deli* in the course of defending the lawsuit.

63. North Carolina's appellate courts have not yet had an occasion to rule on the issue of whether conduct by an insurer that occurs *after* the insured has initiated coverage litigation can give rise to liability under § 58-63-15(11) (and, by extension, the UDTPA).

64. There appears to be a jurisdictional split among courts in other jurisdictions on this subject.[8] Courts have essentially followed one of three main approaches: (1) categorically prohibiting all evidence of an insurer's post-filing conduct, (2) allowing only evidence of an insurer's post-filing acts dealing with the issue of settlement, or (3) considering post-filing acts by the insurer related to not only settlement but also to litigation tactics, strategies, and techniques. *Compare Parker v. S. Farm Bureau*

---

[8] Although this Court is, of course, not bound by decisions from other jurisdictions in ruling on an issue of North Carolina law, it is permitted to consider such cases that it deems to be instructive. *See Carolina Power & Light Co. v. Emp. Sec. Comm'n of N.C.*, 363 N.C. 562, 569 (2009).

*Cas. Ins. Co.*, 326 Ark. 1073, 1085 (1996) ("Therefore, none of the conduct by Farm Bureau after the filing of the complaint, including legal positions asserted, can provide a basis for Parker's bad-faith claim."), *with Palmer by Diacon v. Farmers Ins. Exch.*, 261 Mont. 91, 121–22 (1993) ("Courts have held, and we agree, that an insurer's duty to deal fairly and not to withhold payment of valid claims does not end when an insured files a complaint against the insurer." However, "[a]llowing evidence of litigation strategies and tactics would expose the insurer's entire defense in a coverage action to scrutiny by the jury[.]"), *and Home Ins. Co. v. Owens*, 573 So.2d 343, 344 (Fla. Dist. Ct. App. 1990) (stating that, under prior caselaw, in "a bad faith case . . . the insurance company's litigation conduct was admissible, relevant evidence").

65. However, the Court need not conclusively resolve this issue at the pleadings stage in order to deny Defendants' Motion to Dismiss Tanger's UDTPA claim. For purposes of Rule 12(b)(6), it suffices to say that Defendants have not met their burden of showing statutory or case law clearly establishing that North Carolina does not permit a UDTPA claim under these circumstances.

66. Moreover, the Court notes that at least two federal courts in North Carolina have denied Rule 12 motions as to claims alleging a breach of N.C.G.S. § 58-63-15(11) where the plaintiff alleged that the insurer failed to revise its earlier position based on the provision of new information. *See Rose Hill United Methodist Church v. Church Mut. Ins. Co.*, 2022 U.S. Dist. LEXIS 123369, at *33–34 (E.D.N.C. July 11, 2022) (denying motion for judgment on the pleadings under § 58-63-15(11), in part,

because plaintiff alleged that the insurer refused to revise its offer after being informed that three construction vendors had quoted figures almost three times greater than the estimate received from the insurer); *Hunter v. State Farm Fire & Cas. Co.*, 2018 U.S. Dist. LEXIS 127032, at *9–10 (W.D.N.C. July 30, 2018) (denying motion to dismiss under § 58-63-15 where plaintiff alleged that he provided the insurer with statements from a consultant, yet the insurer failed to revise its prior denial of coverage).

67.     The Court also observes that one state's supreme court has held that a bad faith claim could proceed past the summary judgment stage where the insurer failed to consider relevant case law submitted to it by the insured.  *See Walz v. Fireman's Fund Ins. Co.*, 556 N.W.2d 68, 73 (S.D. 1996) (reversing entry of summary judgment because a genuine issue of material fact existed regarding "whether failure to timely review pertinent caselaw constituted a reckless disregard o[r] a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured") (cleaned up).

68.     Therefore, Defendants' Motion to Dismiss is **DENIED** with regard to Tanger's UDTPA claim.

### III. Breach of the Implied Covenant of Good Faith and Fair Dealing

69.     In their final argument, Defendants argue that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is barred by the applicable three-year statute of limitations set out in N.C.G.S. § 1-52(1).  Defendants contend that, under North Carolina law, the limitations period for this claim began to accrue on 30

June 2021—the date of Defendants' original denial of coverage—yet Tanger did not initiate this action until 12 March 2025.

70. In response, Tanger asserts that the applicable limitations period for this claim is actually five years pursuant to Florida law as a result of a specific provision contained in the Policies.

71. Tanger's argument is based on Section 56 of the Policies, which provides as follows:

> No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this policy. The Company agrees that any action or proceeding against it for recovery of any loss *under this policy* shall not be barred if commenced within the time prescribed theretofore in the statutes of the State of *Florida*.

(ACE Policy § 56; Liberty Policy § 56 (emphasis added)).

72. Defendants contend that Plaintiff's bad faith claim seeks *extracontractual* damages and thus cannot properly be characterized as a claim for "recovery of [a] loss under this policy" for purposes of Section 56. Tanger, conversely, maintains that a covenant of good faith is implied in every contract such that this claim is not, in fact, extracontractual and instead fits within the above-quoted language in Section 56.

73. Based on the Court's initial review of this provision, the applicability of the phrase "recovery of any loss under this policy" to a claim for breach of the covenant of good faith and fair dealing is a question that does not appear to be free from ambiguity.

74. It is well settled that ambiguities in insurance policies are to be construed against the insurer and in favor of the insured. *See, e.g., Wachovia Bank & Tr. Co. v.*

*Westchester Fire Ins. Co.*, 276 N.C. 348, 354 (1970) ("The words used in the policy having been selected by the insurance company, any ambiguity or uncertainty as to their meaning must be resolved in favor of the policyholder, or the beneficiary, and against the company."); *N.C. Farm Bureau Mut. Ins. Co. v. Stox*, 330 N.C. 697, 708 (1992) ("As our rules of construction dictate, all ambiguities must be resolved in favor of the insured.").

75.     Thus, at least for purposes of the current pleadings stage of this case, the Court finds that the phrase "recovery of any loss under this policy" should be construed in favor of Tanger.

76.     As a result, the Court must determine the applicable limitations period for this claim under Florida law.

77.     The Florida Supreme Court has made clear that no common law claim for bad faith exists in the context of first party insurance disputes and that such claims are instead encompassed by section 624.155 of the Florida Statutes.    In *QBE Insurance Corp. v. Chalfonte Condominium Apartment Ass'n*, the Florida Supreme Court stated the following on this issue:

> In 1982, the Legislature enacted section 624.155 of the Florida Statutes, the so-called "Bad Faith Statute."  *See* ch. 82-243, § 9, Laws of Fla.  This statute was "designed and intended to provide a civil remedy for any person damaged by an insurer's conduct." *Ruiz*, 899 So.2d at 1124. Section 624.155(1)(b)1, Floridia Statutes (2009), provides:
>
> > (1) Any person may bring a civil action against an insurer when such person is damaged:
> >
> > . . . .
> >
> > (b) By the commission of any of the following acts by the insurer:

1. Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests. . . .

Thus, section 624.155(1)(b)1 created a statutory first-party bad-faith cause of action and codified prior decisions authorizing a third party to bring a bad-faith action under the common law.

. . . .

Federal courts have interpreted this Court's various decisions as evidence that there is no common law action for breach of the implied warranty of good faith and fair dealing in the first-party coverage context and the only remedy available is the statutory bad-faith action created by section 624.155. *Nirvana*, 589 F. Supp. 2d at 1342 ("[A]s the Florida Supreme Court has repeatedly made clear, no theory of liability was *ever* available to an insured against the insurer until 1982. That clearly includes a contractual theory of liability based on the implied covenant or warranty of good faith and fair dealing."); *Dome*, 577 F. Supp. 2d at 1261 (stating that a claim for breach of the implied covenant of good faith and fair dealing did not exist prior to the passage of section 624.155).

. . . .

For the reasons discussed above, the Court answers the first certified question in the negative and concludes that such first-party claims are actually statutory bad-faith claims that must be brought under section 624.155 of the Floridia Statutes.

94 So.3d 541, 546-49 (Fla. 2012).

78.  A claim under § 624.155 is governed by a four-year statute of limitations. *See Anoushfar v. Lexington Ins. Co.*, 2025 U.S. Dist. LEXIS 161225, at *5 (M.D. Fla. Aug. 20, 2025) (concluding that for first-party bad faith claims "the applicable statute of limitations . . . is four years"); *see also Andreasen v. Progressive Express Ins. Co.*, 2017 U.S. Dist. LEXIS 142456, at *18 (S.D. Fla. Aug. 25, 2017) ("A . . . § 624.155 bad

faith claim is '[a]n action founded on a statutory liability' and is therefore governed by the four year statute of limitations." (citations omitted)).

79.     Having determined that the applicable limitations period for Tanger's bad faith claim is four years, the question remains as to when this claim began to accrue.

80.     Several courts applying North Carolina law have held that bad faith claims in this context first accrue on the date of loss. *See, e.g., Page v. Lexington Ins. Co.*, 177 N.C. App. 246, 251 (2006) ("[P]laintiffs' claims for breach of contract, breach of fiduciary duty, *and bad faith* arose on [the date of the loss.]") (emphasis added); *Lanier v. State Farm Fire & Cas. Co.*, 2009 U.S. Dist. LEXIS 26407, at *7 (W.D.N.C. Mar. 30, 2009) (holding that a bad faith denial of coverage claim arises out of contract and is subject to a three-year statute of limitations that "begins to run upon the 'inception of the loss' "); *Bear Invs., LLC v. Penn Nat'l Mut. Ins. Co.*, 2023 U.S. Dist. LEXIS 200978, at *12 (E.D.N.C. Nov. 8, 2023) ("Where plaintiff was insured against direct physical loss of or damage to covered property, the three-year limitations period on plaintiff's bad faith claim began to run on the date of the 'inception of the loss[.]' ") (cleaned up); *Quillen v. Allstate Corp.*, 2014 U.S. Dist. LEXIS 163577, at *7 (W.D.N.C. Oct. 29, 2014) (determining that "like [p]laintiffs' breach of contract claim, the bad faith claim accrued upon the date of the actual loss").

81.     Thus, since the Complaint in this case was originally filed on 12 March 2025, the final question is whether the loss occurred by 12 March 2021.

82.     Defendants direct the Court to paragraph 128 of the Amended Complaint in which Plaintiff alleges that it provided notice of loss to Defendants on or about 7

April 2020. (Am. Compl. ¶ 128.) However, in the next paragraph Tanger states that as of 7 May 2021 "its losses were still being assessed and remained ongoing[.]" (Am. Compl. ¶ 129.) Therefore, discovery is necessary to determine the applicable date of loss.

83.    Accordingly, Defendants' Motion to Dismiss is **DENIED** as to Tanger's claim for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

84.    For the reasons set forth above, Defendants' Motion to Dismiss is **DENIED**.

**SO ORDERED**, this the 27th day of October 2025.

/s/ Mark A. Davis

Mark A. Davis
Special Superior Court Judge for
Complex Business Cases